[L.A. No. 30455. Sept. 3, 1976.]

TORREY WOOD PAYNE, Petitioner, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY,
Respondent;
SOUTH BAY SENTRY DOGS, INC., Real Party in Interest.

**COUNSEL**

Torrey Wood Payne, in pro. per., and William Sheffield, under appointment by the Supreme Court, for Petitioner.

Michael B. Weisz and Stan Gunterman as Amici Curiae on behalf of Petitioner.

John H. Larson, County Counsel, and Michael H. Dougherty, Deputy County Counsel, for Respondent.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, Russell Iungerich, Shunji Asari and Carol Wendelin Pollack, Deputy Attorneys General, as Amici Curiae on behalf of Respondent.

No appearance for Real Party in Interest.

## OPINION

**MOSK, J.**—Few liberties in America have been more zealously guarded than the right to protect one's property in a court of law. This nation has long realized that none of our freedoms would be secure if any person could be deprived of his possessions without an opportunity to defend them " 'at a meaningful time and in a meaningful manner.' " (*Fuentes* v. *Shevin* (1972) 407 U.S. 67, 80 [32 L.Ed.2d 556, 569-570, 92 S.Ct. 1983].) In a variety of contexts, the right of access to the courts has been reaffirmed and strengthened throughout our 200-year history.

For one limited category of Californians, however, the right is more illusory than real. An indigent prisoner may be sued civilly by anyone in this state, but is unable to defend against that suit. Although a monetary judgment may pursue him for the rest of his life (Code Civ. Proc., §§ 681, 685), he may not personally appear to prevent its original imposition. If he cannot afford counsel to appear as his surrogate, he will almost inevitably suffer a default judgment. One such prisoner, Torrey Wood Payne, asserts that this denial of access to the courts violates his rights to due process and equal protection of the law under the state and federal Constitutions. We agree with him in principle.

Payne (petitioner) was charged in a criminal complaint with stealing guard dogs from a business competitor, South Bay Sentry Dogs, Inc. A jury convicted him of receiving stolen property, while finding him not guilty of grand theft charges, and he was placed on three years' probation.

Shortly thereafter, South Bay filed a civil complaint against petitioner seeking damages arising from the theft of the guard dogs. The attorney

who had represented petitioner in his criminal trial filed an answer in his behalf.

Several months later, petitioner's probation in the criminal case was revoked and he was sentenced to prison. Petitioner's attorney asked to be relieved as counsel and requested petitioner to sign a release form, as there was little likelihood that the attorney would be paid for services rendered in either the civil or the criminal case.

The civil case soon began its inexorable progress toward trial. Petitioner's request of the Department of Corrections to allow him to attend the civil trial was denied. In another letter, petitioner asked respondent court to dismiss the action against him because he had not received copies of the complaint, pointing out that he was incarcerated.

In petitioner's forced absence, a default judgment was entered against him for $24,722. One month later, petitioner sought a writ of error *coram nobis* in respondent court on the grounds that he had been denied permission to attend the trial and had been denied his right to counsel. Treating the petition as a motion to vacate a default judgment (Code Civ. Proc., § 473), the court rejected the request.

In the Court of Appeal petitioner filed another document which was treated as a petition for writ of mandate; it too was denied. He then petitioned this court; we granted a hearing, appointed counsel for these proceedings, requested a supplemental petition for writ of mandate, and issued an alternative writ.

We must decide not only whether petitioner was unconstitutionally deprived of his right of access to the courts, but if so, what the appropriate remedy should be, and whether proceeding by writ of mandate is proper under these circumstances. As the resolution of the latter two issues depends in part on the validity of petitioner's constitutional claim, we begin with that question.

Contrary to the state's assertions,[1] the force of petitioner's contentions is in no way affected by Penal Code section 2600, once known as a "civil death" statute. At the time proceedings were initiated in the present case,

---

[1]For literary convenience the contentions of respondent court, represented by the Los Angeles County Counsel, and those of the Attorney General as amicus curiae are categorized herein as arguments of the state. South Bay Sentry Dogs, Inc., the real party in interest, has not filed a brief.

that statute purported to suspend all civil liberties of a prisoner except a few specifically enumerated rights and those authorized by the Adult Authority or the sentencing judge. However, it has long been judicially recognized in California and in states with similar statutes that "prisoners, while forfeiting, as a necessary corollary of prison life, significant rights and privileges enjoyed by the general populace, retain those basic rights which are not incompatible with the running of the penal institution." (*Newkirk* v. *Butler* (S.D.N.Y. 1973) 364 F.Supp. 497, 501; see also *In re van Geldern* (1971) 5 Cal.3d 832, 836 [97 Cal.Rptr. 698, 489 P.2d 578].) Recently the Legislature itself made this clear, amending section 2600 to provide that a prisoner may "be deprived of such rights, and only such rights, as is necessary in order to provide for the reasonable security of the institution in which he is confined and for the reasonable protection of the public." Thus section 2600 furnishes little support for the state's position, and we must evaluate this denial of access to the courts in light of constitutional mandates.

The issue before us has not been squarely faced in California, although both petitioner and the state may take some comfort in the language of certain Court of Appeal decisions dealing with prisoners as civil defendants. In *People* v. *Lawrence* (1956) 140 Cal.App.2d 133 [295 P.2d 4], the court struck down a statute allowing an insurance company to recover property allegedly stolen by a prisoner, on the ground that the statute did not provide for notice and an opportunity to be heard. Similarly, the court in *In re McNally* (1956) 144 Cal.App.2d 531 [301 P.2d 385], ruled that a prisoner was entitled to engage paid counsel, reasoning that a prisoner's liability to be sued necessarily carries with it a right to defend.

The right to defend, however, has been tempered by judicial determination that a prisoner has no right to appear personally in court to protect his property. (*Wood* v. *Superior Court* (1974) 36 Cal.App.3d 811 [112 Cal.Rptr. 157]; *In re McNally* (1956) *supra,* 144 Cal.App.2d 531, 532; *In re Bagwell* (1938) 26 Cal.App.2d 418, 420-421 [79 P.2d 395] (dealing with a prisoner who was plaintiff in a civil suit).) Yet in none of these cases did the courts confront the dual deprivation facing an indigent prisoner.[2] What is at stake is neither the abstract right of a prisoner to appointed counsel nor his right to appear personally in court. Instead, the issue is the propriety of depriving indigent prisoners of both those rights and thereby virtually denying their access to the courts.

[2]While the *Wood* court noted that the prisoner in that case was indigent, it did not mention the dual deprivation issue.

The task in evaluating this denial is similar in both its due process and equal protection aspects. In either case, we must determine whether state action has infringed upon a fundamental right of petitioner. If it has, the state action can be upheld only if necessary to effect an overriding governmental interest. (*Boddie* v. *Connecticut* (1971) 401 U.S. 371, 377 [28 L.Ed.2d 113, 118-119, 91 S.Ct. 780]; *Shapiro* v. *Thompson* (1969) 394 U.S. 618, 634 [22 L.Ed.2d 600, 614-615, 89 S.Ct. 1322].) As a corollary to this compelling state interest test, the government must show that its interest cannot be satisfied by alternative methods less restrictive of the individual right abridged.

■  The Fourteenth Amendment to the United States Constitution prohibits a state from depriving any person of property without due process of law.[3] This mandate has been interpreted to require, at a minimum, that "absent a countervailing state interest of overriding significance, persons forced to settle their claims of right and duty through the judicial process must be given a meaningful opportunity to be heard." (*Boddie* v. *Connecticut* (1971) *supra,* 401 U.S. at p. 377 [28 L.Ed.2d at pp. 118-119].) Thus, the United States Supreme Court has long recognized a constitutional right of access to the courts for all persons, including prisoners. (*Procunier* v. *Martinez* (1974) 416 U.S. 396, 419 [40 L.Ed.2d 224, 243, 94 S.Ct. 1800]; *Cruz* v. *Beto* (1972) 405 U.S. 319, 321 [31 L.Ed.2d 263, 267-268, 92 S.Ct. 1079]; *Johnson* v. *Avery* (1969) 393 U.S. 483, 487 [21 L.Ed.2d 718, 722, 89 S.Ct. 747]; *Price* v. *Johnston* (1948) 334 U.S. 266 [92 L.Ed. 1356, 68 S.Ct. 1049].)

For the most part this access right has been related to review of criminal convictions, particularly by writs of habeas corpus. (See, e.g., *Price* v. *Johnston* (1948) *supra,* 334 U.S. 266 (prisoners granted right, on case-by-case basis, to orally argue their appeals; *Johnson* v. *Avery* (1969) *supra,* 393 U.S. 483 (rule prohibiting inmate assistance on habeas corpus petitions struck down).) But as one federal court has noted, the due process right is much broader: "it includes access to all courts, both state and federal, without regard to the type of petition or relief sought." (*Hooks* v. *Wainwright* (M.D.Fla. 1972) 352 F.Supp. 163, 167.) Thus, a number of courts have granted prisoners protective and assertive rights in civil actions. As early as 1914, the Virginia Supreme Court of Appeals recognized the injustice of a situation similar to that faced by the prisoner involved here: "Process at the institution of a suit is issued in

---

[3]Article I, section 7, subdivision (a), of the California Constitution provides the same basic guarantee; we render our decision herein equally upon its terms.

order that the defendant may appear and defend. When it is served upon a convict, he is notified to do that which is impossible: The law commands him to appear and defend his interests, and the law of the same state which notified him to appear has him safe under lock and key so that he cannot appear. To say that this is due process of law is indeed to 'keep the word of promise to the ear and break it to the hope.' " (*Merchant's Adm'r* v. *Shry* (1914) 116 Va. 437 [82 S.E. 106, 108].) The court reasoned that the most equitable solution was to appoint a committee to represent the financial interests of a prisoner and appear for him in court.

In *Bagley* v. *Bagley* (1968) 57 Misc.2d 388 [292 N.Y.S.2d 796], a prisoner who was sued for divorce sought to appear personally in court. The court concluded that "The basic issue is whether or not the defendant, in the particular circumstances of the case, will be able to establish his defense without being personally present upon the trial. If he cannot, the denial of personal presence would be a denial of due process." (*Id.,* at pp. 798-799.)

In the landmark case of *Boddie* v. *Connecticut* (1971) *supra,* 401 U.S. 371, the Supreme Court ruled that indigents could not be forced to pay a filing fee in order to dissolve their marriage. Significantly, in establishing the importance of the access right involved in the case, the court used the problems often faced by indigent civil defendants as a benchmark: "The legitimacy of the State's monopoly over techniques of final dispute settlement, even where some are denied access to its use, stands unimpaired where recognized, effective alternatives for the adjustment of differences remain. But the successful invocation of this governmental power by plaintiffs has often created serious problems for defendants' rights. For at that point, the judicial proceeding becomes the only effective means of resolving the dispute at hand and denial of a defendant's full access to that process raises grave problems for its legitimacy." (*Id.,* at pp. 375-376 [28 L.Ed.2d at pp. 117-118].)

Two subsequent Supreme Court decisions limited somewhat the scope of *Boddie,* but did not alter the impact of the decision on the rights of civil defendants. In *United States* v. *Kras* (1973) 409 U.S. 434 [34 L.Ed.2d 626, 93 S.Ct. 631], the court found no constitutional infirmity in the requirement that an indigent debtor pay a $50 filing fee in order to obtain a discharge in bankruptcy. This decision was followed by *Ortwein* v. *Schwab* (1973) 410 U.S. 656 [35 L.Ed.2d 572, 93 S.Ct. 1172], in which the court upheld the validity of a $25 filing fee required for appellate

review of an agency determination resulting in lower welfare payments for a poor person.

Each of the latter opinions carefully distinguished *Boddie* in two major respects. First, in both decisions the court reasoned that the underlying interest the indigent litigant was seeking to protect in court was not as constitutionally significant as the dissolution of marriage. In *Kras,* the court declared that bankruptcy was merely a statutory remedy, whereas decisions affecting marriage are constitutionally protected: "Gaining or not gaining a discharge [in bankruptcy] will effect no change with respect to basic necessities. We see no fundamental interest that is gained or lost depending on the availability of a discharge in bankruptcy." (409 U.S. at p. 445 [34 L.Ed.2d at pp. 635-636].) Comparable reasoning was employed in *Ortwein* (410 U.S. at p. 659 [35 L.Ed.2d at pp. 575-576]).

In contrast, a defendant in a civil case seeks not merely the benefit of a statutory expectancy, but the protection of property he already owns or may own in the future.[4] The distinction can be seen by hypothesizing legislative attempts to eliminate the rights involved in *Kras, Ortwein,* and the present case. Congress could permissibly repeal all bankruptcy laws; similarly, a state legislature is under no constitutional mandate to provide welfare payments. But absent a constitutional amendment, it is beyond question that neither Congress nor any state legislature could provide for extensive confiscation of private property without compensation. Thus the underlying right petitioner seeks to protect equals in constitutional significance the right to dissolve a marriage that was protected in *Boddie.*

The second major articulated distinction among the cases is that the indigents in *Kras* and *Ortwein,* unlike the couple in *Boddie,* were not compelled to rely solely on the courts to pursue their interests. In *Boddie,* of course, the indigent couple could legally dissolve its marriage only through the court system. In *Kras,* on the other hand, the court declared that "In contrast with divorce, bankruptcy is not the only method available to a debtor for the adjustment of his legal relationship with his creditors. . . . However unrealistic the remedy may be in a particular situation, a debtor, in theory, and often in actuality, may adjust his debts

---

[4]The state argues that if petitioner is really indigent he has nothing to lose from a damage suit. However, section 681 of the Code of Civil Procedure allows a victorious plaintiff to enforce a judgment in his favor at any time during the 10 years after its entry. Section 685 provides that the judgment may be enforced even after the 10-year period by use of supplemental proceedings.

by negotiated agreement with his creditors." (409 U.S. at p. 445 [34 L.Ed.2d at pp. 635-636].) In *Ortwein,* the court also found that indigents had alternatives to the courts—i.e., administrative hearings: "The hearings provide a procedure, not conditioned on payment of any fee, through which appellants have been able to seek redress." (410 U.S. at pp. 659-660 [35 L.Ed.2d at pp. 575-576].)

It is evident, of course, that the petitioner in the present case has no alternative to the court system to protect his interests. Formally thrust into the judicial process, he may not, like the indigent debtor in *Kras,* informally settle his dispute. And unlike the plaintiff in *Ortwein,* he has no alternative opportunity to obtain an administrative hearing. In this respect, his position is identical to that of the indigents in *Boddie,* a circumstance recognized not only by the court in *Boddie,* but also by the *Kras* court. (409 U.S. at pp. 441, 444 [34 L.Ed.2d at pp. 633-635].)

However, it is argued that unlike the inability to pay the filing fees in *Boddie,* petitioner's disabilities do not absolutely foreclose him from access to the courts. If a person cannot pay a filing fee, he manifestly cannot pursue his case in court; but the state maintains that indigent prisoners have alternative means of insuring that they will be heard. In order to ascertain the extent to which petitioner's access right has been infringed, it is necessary to examine the proposed alternatives.

First, it is suggested that prisoners, like other indigent civil litigants, may solicit free legal counsel. This possibility has been judicially recognized as an alternative to appointed counsel for ordinary civil litigants. In *Hunt* v. *Hackett* (1973) 36 Cal.App.3d 134 [111 Cal.Rptr. 456], the court, holding that indigent civil litigants do not have a right to appointed counsel, surmised that the result was not necessarily harsh. The court pointed to existing alternatives to appointed counsel, including services provided by legal aid societies, public defenders in some instances (Gov. Code, § 27706, subd. (c)), and California attorneys who have the ethical duty not to reject the cause of the defenseless or the oppressed (Bus. & Prof. Code, § 6068, subd. (h)).

But the indigent prisoner often lacks even the limited resources of his nonprisoner impoverished counterpart. "The prisoner, a person committed to the custody of a designated state agency, is effectively severed from society. He has and receives what the custodian grants, and nothing more." (*Hooks* v. *Wainwright* (M.D.Fla. 1972) *supra,* 352 F.Supp. 163, 167.) Shut off from most contacts with the world outside his prison, he is

unlikely to have ready access to or even information about legal aid societies or attorneys willing to perform *pro bono* work. The problem is particularly acute in this state, where the "remoteness of many California penal institutions makes a personal visit to an inmate client a time-consuming undertaking" for counsel. (*Procunier* v. *Martinez* (1974) *supra*, 416 U.S. 396, 420 [40 L.Ed.2d 224, 244, 94 S.Ct. 1800].) Not one state prison is located in any of the nine most populous counties in the state, the counties in which the greater number of members of the bar practice. (*In re Tucker* (1971) 5 Cal.3d 171, 183 [95 Cal.Rptr. 761, 486 P.2d 657].)

The result, as the Supreme Court has recognized, is that "For private matters of a civil nature, legal counsel for the indigent in prison is almost non-existent." (*Johnson* v. *Avery* (1969) *supra*, 393 U.S. 483, 493 [21 L.Ed.2d 718, 725-726] (Douglas, J., concurring).) The court in *Johnson* therefore rejected a warden's argument that allowing a prisoner to consult a city telephone directory for lawyers adequately preserved his right of access. In California, a State Bar committee has found that "legal services to prison inmates . . . are completely unavailable on a systematic basis." (State Bar of California Model Inmate Assistance Program, Final Report: Planning/Study Phase, May 1, 1975, p. 1.) Petitioner's theoretical right to find his own voluntary counsel, accordingly, provides little realistic access to the courts.

The state also urges that the statutes permitting a party to depose a prisoner-witness under certain circumstances (Pen. Code, §§ 2622-2623) provide petitioner with an adequate substitute for personal appearance or appointed counsel. Even if we assumed the applicability of this procedure to the case of a prisoner who is himself a party but has no counsel, the contention ignores the fact that "Jails and penitentiaries include among their inmates a high percentage of persons who are totally or functionally illiterate, whose educational attainments are slight, and whose intelligence is limited." (*Johnson* v. *Avery* (1969) *supra*, 393 U.S. 483, 487 [21 L.Ed.2d 718, 722]; *Brown* v. *Pitchess* (1975) 13 Cal.3d 518, 524 [119 Cal.Rptr. 204, 531 P.2d 772].) The quality of the documents this petitioner has filed to date demonstrate it is unlikely that his cause would be aided by his written testimony. And even if his depositions were of the highest legal quality, petitioner would still be denied the right to present witnesses on his own behalf and to cross-examine opposing witnesses.

Similarly it benefits petitioner only minimally that he may obtain assistance from more experienced inmates, sometimes known as "jail-

house lawyers." (*Johnson* v. *Avery* (1969) *supra,* 393 U.S. 483.) Whatever his legal expertise, usually limited to writ preparation, a jailhouse lawyer has no right to appear for petitioner in court.

In short, petitioner, as an indigent prisoner seeking to defend a civil suit, has a due process right of access to the courts which has been abridged. The state has the burden of demonstrating a compelling state interest to justify the infringement.

█ The denial of access also constitutes a prima facie equal protection violation.[5] Indigent prisoners are denied access to the courts to defend a civil suit, while free persons and prisoners possessing the means to hire counsel retain an access right. As has been established, to be heard in court to defend one's property is a right of fundamental constitutional dimension; in order to justify granting the right to one group while denying it to another, the state must show a compelling state interest. (*Shapiro* v. *Thompson* (1969) *supra,* 394 U.S. 618, 634 [22 L.Ed.2d 600, 614-615].)

Seeking to justify petitioner's deprivation, the state relies extensively on *Wood* v. *Superior Court* (1974) *supra,* 36 Cal.App.3d 811. The *Wood* court listed a number of state interests to rationalize the denial of the right of personal appearance. Some of them, if legitimate and applicable, arguably support the deprivation in the present case. The court reasoned, "First, the state cannot properly bear the cost of transporting the prisoner from the prison to the county where the trial is to occur, since the trip would be for the prisoner's private benefit, not the state's [citations]. Second, prison officials and others assigned to guard the prisoner during his transportation and at the trial would be exposed to danger and unnecessary risk [citation]. Third, a rule allowing prisoners to personally attend trials might lead to spurious and time-consuming lawsuits contrived to allow them to avoid confinement in their designated institutions. Finally, extended absences from the prison, hospital or treatment center might interfere with whatever program of rehabilitation, training or treatment the prisoner is taking." (*Id.,* at pp. 813-814.) These purported interests must be explored.

Initially, we fail to see how providing counsel for prisoners or allowing them to appear personally could constitute the type of gift of public

[5]The Fourteenth Amendment provides that a state may not "deny to any person within its jurisdiction the equal protection of the laws." California's constitutional provision is article I, section 7, subdivision (a): "A person may not be denied equal protection of the laws." (See also subd. (b) of the same section.)

funds for a private purpose prohibited by article XVI, section 6, of the state Constitution. The state may lawfully provide transportation for a necessary court appearance under the same rationale that compels it to feed, clothe, and shelter a prisoner. Moreover, aiding the judicial process and preserving constitutional rights cannot be deemed a "gift."

A related argument by the state is that appointing counsel or allowing a prisoner to appear personally in his defense will impose a heavy burden on the public fisc. We question how substantially state costs would be increased if either remedy were adopted. By statute, a prisoner is already granted personal appearance rights in certain family disputes, probably the most common area of civil litigation for prisoners: when a proceeding is brought to terminate the parental rights of a prisoner, he has the right to appear; and a trial court may order his presence in any action in which his parental or marital rights are to be adjudicated. (Pen. Code, § 2625.) As for the possibility of other kinds of actions against prisoners, the state has offered no empirical evidence on how often prisoners are sued. Notwithstanding the present case, we doubt that numerous plaintiffs will undergo the expense of litigation when the prospects for substantial recovery depend not only on victory on the merits of their cases but also on the possibility that indigent defendants will become adequately solvent after release from prison.

Nor do we find any merit whatever in the state's contention that appointment of counsel for prisoners will discourage settlement of cases. To the contrary: at present plaintiffs have no incentive to settle, as they may easily obtain default judgments; equalizing the litigation resources of the parties would likely motivate both litigants, acting through responsible counsel, to compromise the suit and to keep any damage recovery within realistic limits. It is cynical to suggest that the only incentive for a civil litigant to compromise is the expense of legal fees. If this were accurate, legal aid societies, other lawyers representing the poor, or even lawyers representing the state, would never settle a case—a demonstrably inaccurate supposition.[6] In any event, the Supreme Court has held that financial savings cannot justify an otherwise unconstitution-

[6]The state also apparently assumes that if this court orders counsel appointed in certain cases, it will mandate that counsel be paid from public funds. We do not assert such power. If and how counsel will be compensated is for the Legislature to decide. Until that body determines that appointed counsel may be compensated from public funds in civil cases, attorneys must serve gratuitously in accordance with their statutory duty not to reject "the cause of the defenseless or the oppressed." (Bus. & Prof. Code, § 6068, subd. (h).)

al state action. (*Shapiro* v. *Thompson* (1969) *supra,* 394 U.S. 618, 633 [22 L.Ed.2d 600, 614].)

The second state interest advanced in *Wood*—protecting prison officials and the civil courts from the danger presented by prisoners— cannot justify denying the right of personal appearance *and* appointment of counsel. At most it supports the denial of a prisoner's right to appear. But even that proposition is debatable, for prisoners are now being regularly transported to criminal trials, as both defendants and witnesses, with a minimum of incidents. If the state asserts that civil courts are less able than criminal courts to protect against prisoner violence, it must explain why prisoners with marital or parental difficulties are allowed to appear in civil courts under Penal Code section 2625. That section, on its face, draws no distinction between forgers and mass murderers, a circumstance which casts doubt upon the contention that protection against physical danger to the civil courts is a compelling state interest. To the extent that such danger actually exists in a limited number of cases, it would seem more constitutionally appropriate for the state to make an individual articulable determination that a particular prisoner is by his record and conduct too prone to violence or escape to be delivered to court from penal confinement than to deny all prisoners the right of personal appearance.

Third, the *Wood* court feared that prisoners would contrive suits against themselves in order to obtain a respite from confinement. But prisoners are far more likely to file frivolous suits as plaintiffs than they are to contrive opposition suits. The latter activity requires at the very least a confederate with enough knowledge of the law, and generally the availability of private counsel, to file proper pleadings. If this were a serious possibility, surely the state would have presented us with data that spouses of prisoners are flooding the courts with frivolous divorce or child custody claims in order to secure personal appearances under Penal Code section 2625. Furthermore, no contention has been made in this case that petitioner has contrived a $25,000 default judgment against himself.

A similar state argument was made in *Boddie* v. *Connecticut* (1971) *supra,* 401 U.S. 371, in support of filing fees. But the high court answered, "Not only is there no necessary connection between a litigant's assets and the seriousness of his motives in bringing suit, but it is here beyond dispute that appellants bring these actions in good faith. Moreover, other alternatives exist to fees and cost requirements as a

means for conserving the time of courts and protecting parties from frivolous litigation, such as penalties for false pleadings or affidavits, and actions for malicious prosecution or abuse of process, to mention only a few." (*Id.,* at pp. 381-382 [28 L.Ed.2d at pp. 121-122].) Similar alternatives exist in the present matter.

Finally, the *Wood* court's declaration that allowing a prisoner personal appearance rights might hinder rehabilitation efforts will not support the dual deprivation in question here. Although it might justify denying a prisoner an unlimited right of personal appearance in court, it does not justify a denial of the right to counsel.

Rehabilitation is undoubtedly a prime goal of imprisonment, but it is difficult to comprehend how depriving a person of the means to protect his property can aid his adjustment to society. The contrary result seems probable. As one commentator has pointed out, "Efforts to rehabilitate inmates can easily be frustrated by external events which are unsettling to the inmate and cause him to become embittered." (Note, *Resolving Civil Problems of Correctional Inmates,* 1969 Wis.L.Rev. 574, 577.) One of those "external events" is a substantial default judgment that may be enforced against a prisoner years after he is released.

Another factor inhibiting the rehabilitation of a prisoner denied access to the courts is the cynicism about the legal system that such denial is likely to engender. As one prisoner put it, "It is impossible to calculate the social harm generated by prisoners' lack of respect for the law stemming from being denied the assistance of counsel while litigating their cases in prison." (Larsen, *A Prisoner Looks at Writ-Writing* (1968) 56 Cal.L.Rev. 343, 352.) While the prisoner was speaking of the denial of counsel to assist inmates in filing writs of habeas corpus, his observation is equally applicable to the instant circumstances. A prisoner is confined behind bars because of his failure to conform his behavior to the law. A successful rehabilitation program should inculcate in him a healthy respect for the rule of law. But it is highly unlikely that a prisoner could learn to respect a regime that threatens to deprive him of present and future possessions and allows him to defend his possessory rights only if he is affluent enough to afford a lawyer. The conclusion is inescapable that the state's interest in rehabilitation will not justify denying a prisoner his right of access to the courts.

As no state interests can thus be advanced in support of the denial of access to the courts, we conclude that such unqualified

deprivation constitutes a violation of petitioner's rights under the due process and equal protection clauses of both the state and federal Constitutions.[7]

The establishment of petitioner's right, however, does not necessarily mandate a particular remedy. Petitioner has demonstrated that the dual deprivation of appointed counsel and the right to personal presence in court is unconstitutional, but not that the denial of each of those rights individually is invalid. Indeed, to grant petitioner an absolute right to both appointed counsel and personal appearance would achieve the anomalous result of according him greater privileges than those possessed by an ordinary indigent civil litigant.

One possible solution to this dilemma is to accord prisoners the right of personal appearance to defend any action, but to deny indigent prisoners appointed counsel. This approach has the advantage of superficial symmetry. It appears to place the indigent prisoner in the same position as the indigent free person: each would have the right to appear, and to employ counsel if able to do so. However, as has been shown, prisoners do not have the same access to free legal services as other indigents. Equally significant, a prisoner, unlike a free person, is not able to seek out witnesses in his behalf or undertake the investigative functions often needed to defend a civil suit. When these factors are combined with the limited education and intelligence level of substantial numbers of prisoners, it becomes clear that allowing a right of personal appearance is not an appropriate remedy for prisoners seeking to defend a civil action.

Another alternative is to require trial courts to defer trial of actions against prisoners until their release. When this course of action is not prohibited by law (see, e.g., Code Civ. Proc., § 1054) and postponement will not substantially prejudice the rights of plaintiffs, trial courts may exercise their discretion in this manner.

However, in many situations, particularly when a defendant is serving a long term of confinement, a postponement will substantially impair the interests of the plaintiff. In those cases the only feasible method of granting access rights to indigent prisoners is appointment of counsel. Whether counsel will be drawn from the ranks of legal aid attorneys, other public or privately funded lawyers serving the disadvantaged,

---

[7]Insofar as it conflicts with this opinion, *Wood* v. *Superior Court* (1974) 36 Cal.App.3d 811 [112 Cal.Rptr. 157], is disapproved.

public defenders if so authorized to act, or the private bar, is a question that we leave to the sound discretion of trial courts. We recognize, of course, that funds for payment for the services of the appointed attorneys are unavailable until such time as authorized by the Legislature. (Fn. 6, *ante.*) All we hold is that denial of appointed counsel to an indigent prisoner, when no other relief will preserve his right of access to the courts, is constitutionally impermissible.

We do not rule that appointment of counsel is an absolute right. However, it is in many instances the only remedy enabling a prisoner to obtain access to the courts. The access right, in turn, comes into existence only when a prisoner is confronted with a bona fide legal action threatening his interests. If a prisoner is merely a nominal defendant with nothing of consequence at stake, no need emerges for an appointed attorney. Thus, before appointing counsel for a defendant prisoner in a civil suit the trial court should determine first whether the prisoner is indigent. If he is indigent and the court decides that a continuance is not feasible, it should then ascertain whether the prisoner's interests are actually at stake in the suit and whether an attorney would be helpful to him under the circumstances of the case. The latter determination should be comparatively simple: if the prisoner is not contesting the suit against him, or any aspect of it, there is no need for counsel; but if he plans to defend the action and an adverse judgment would affect his present or future property rights, an attorney should be appointed. (See *Bagley* v. *Bagley* (1968) *supra,* 292 N.Y.S.2d 796 (personal appearance of prisoner in divorce action held unnecessary where prisoner did not contest divorce); *Gagnon* v. *Scarpelli* (1973) 411 U.S. 778, 788-789 [36 L.Ed.2d 656, 665-666, 93 S.Ct. 1756] (case-by-case approach adopted to determine necessity of counsel in probation revocation hearings); Tobriner & Cohen, *How Much Process is "Due"? Parolees and Prisoners* (1974) 25 Hastings L.J. 801, 808.)

While this remedy will probably suffice in most cases, in other instances it may also be desirable for the prisoner to testify on his own behalf. Accordingly, when the trial court determines on motion that the in-court testimony of a prisoner defendant—whether indigent or not—is needed to protect the due process rights of the parties, it may attempt, through the Department of Corrections, to arrange the presence of the prisoner. Except in a few specified circumstances, a court has no statutory authority to command the Department of Corrections to transport a prisoner to a civil courtroom. But judges do have a constitutional duty to uphold the due process clause. Accordingly, if a

court determines that a prisoner's personal testimony is needed to preserve due process rights, but the Department of Corrections refuses accommodation, the court may order a continuance or employ other alternatives to transporting the prisoner, such as recording his testimony or if feasible holding a portion of the trial at the prison.

Not only should the foregoing remedies protect prisoners' constitutional rights, they should have little effect upon the concerns of the state. Most of the state's arguments against granting prisoners their access rights raise the spectre of large-scale, costly, time-consuming and frivolous litigation, and personal appearances by potentially dangerous inmates in the civil courts. With the personal presence of prisoners in civil courtrooms limited to occasions when in the opinion of the trial court their testimony is necessary and in the opinion of the prison administration the transportation can be safely arranged, there will be little incentive for prisoners to manufacture suits against themselves or to prolong existing litigation. And trial courts have at all times ample means to thwart any attempts to misuse the judicial process.

There remains only the question of the propriety of a writ of mandate in the present case. ■ Generally, a writ will lie when there is no plain, speedy, and adequate alternative remedy; the respondent has a duty to perform; and the petitioner has a clear and beneficial right to performance. (Code Civ. Proc., §§ 1085, 1086; 5 Witkin, Cal. Procedure (2d ed. 1971) Extraordinary Writs, § 61, p. 3838.)

The unavailability of another adequate remedy was determined when we granted the alternative writ. (*City of Torrance* v. *Superior Court* (1976) 16 Cal.3d 195, 202 [127 Cal.Rptr. 609, 545 P.2d 1313]; *Musicians Union, Local No. 6* v. *Superior Court* (1968) 69 Cal.2d 695, 700, fn. 2 [73 Cal.Rptr. 201, 447 P.2d 313].) And petitioner clearly has both a right to and a beneficial interest in obtaining access to the courts. Mandate is appropriate, then, if respondent court failed to perform a duty.

■ A court is not under a duty to exercise its discretion in a particular manner (5 Witkin, Cal. Procedure (2d ed. 1971) Extraordinary Writs, § 79, p. 3856), but may be compelled to exercise its discretion in the first instance. (*Schweiger* v. *Superior Court* (1970) 3 Cal.3d 507, 517-518 [90 Cal.Rptr. 729, 476 P.2d 97] (court ordered to hear retaliatory eviction defense in unlawful detainer action); *Nadler* v. *Superior Court* (1967) 255 Cal.App.2d 523, 525 [63 Cal.Rptr. 352] (court ordered to consider all evidence bearing on fitness as a mother of woman denied

custody because she was homosexual).) ■ Ordinarily, a trial court has discretion to deny a motion to vacate a default judgment. A determination by a court that a judgment was properly taken against a party, even if in error, will not generally be reviewable by mandate. ■ But in the present case the trial court's denial of relief under Code of Civil Procedure section 473 apparently was not an act of discretion, but rather a refusal to exercise discretion. When the court was informed by petitioner that the original judgment was taken against him while he was incarcerated and unable to obtain an attorney[8] or personally appear to defend, a duty arose to determine whether petitioner had been denied meaningful access to the courts. The court, as noted, has the discretion to determine whether petitioner is indigent and whether he stands to be deprived of a substantial interest in the proceedings against him.

In the present case petitioner's stake in the proceedings was undisputed, and if the court ascertained that petitioner was indigent it had no other course but to vacate the judgment and appoint counsel.[9] Failure to do so is grounds for writ of mandate.

Finally, we emphasize the limits of our holding. We have not ruled that all indigents have a right to counsel in civil cases. Nor have we established that indigent prisoners who are plaintiffs in civil actions may

[8]Petitioner's communication to the court, while stating that he was incarcerated, did not clearly establish that he was too poor to afford counsel. In fact, he originally did have private counsel. It did, however, state that "Petitioner was denied his right to legal Counsel at this trial." Under the circumstances of the case, such a statement should have led the court to inquire whether petitioner was indigent.

[9]The court may vacate a default judgment taken against a party "through his mistake, inadvertence, surprise or excusable neglect." (Code Civ. Proc., § 473.) Petitioner's failure to contest the judgment because he was denied the means to do so is, of course, excusable neglect as a matter of law. (See *Van Dyke* v. *MacMillan* (1958) 162 Cal.App.2d 594, 599 [328 P.2d 215] (illness of party's counsel preventing him from appearing, held grounds for vacating judgment, providing party was unable in time to obtain new counsel).) The state, arguing that petitioner's neglect cannot be excused, points to a number of flaws in petitioner's legal draftsmanship, notably: (1) his failure to state, in his prejudgment letter to the court declaring that he was presently incarcerated, that he would also be incarcerated at the time of trial one month later; and (2) his failure, in his petition to the court after judgment was entered, to state what his defense would have been at trial. Neither of these flaws is fatal to petitioner's case. If the state's arguments were accepted, a vicious cycle would result: an indigent prisoner would never be able to protest his lack of counsel until he demonstrated in effect by his compliance with every procedural requirement that he did not need counsel in the first place. Only a skilled lawyer is likely to file motions wholly free of procedural defects, and we decline to postpone the vindication of constitutional rights until the arrival of a petition filed by an indigent prisoner who is also a member of the bar.

secure appointed counsel or the right to appear personally. (See *Armstrong* v. *Rushing* (9th Cir. 1965) 352 F.2d 836 (prisoner filing civil rights action denied right to appear personally in court); but see Note, *The Indigent's Right to Counsel in Civil Cases* (1967) 76 Yale L.J. 545, 555 (questioning suggested distinctions between civil plaintiffs and civil defendants).) Neither of those questions is before us, and we do not resolve them here. All we decide is that when a prisoner is threatened with a judicially sanctioned deprivation of his property, due process and equal protection require a meaningful opportunity to be heard. How that is to be achieved is to be determined by the exercise of discretion by the trial court.

Let a peremptory writ of mandate issue, directing respondent court to vacate its judgment in civil action No. C 33884, and, if it finds that petitioner is incarcerated and indigent, to conduct further proceedings in a manner consistent with this opinion.

Wright, C. J., Tobriner, J., and Sullivan, J., concurred.

**RICHARDSON, J.**—I respectfully dissent.

While I have no quarrel with many of the generalities urged by the majority, I am unable to agree with their principal conclusion or the reasoning that leads to it. One can easily resonate to the abstract proposition that indigent prisoners should be afforded both counsel and full opportunity for a personal appearance at trial in the defense of *civil* suits filed against them. Yet the Legislature has not as yet seen fit to establish such procedures and in the absence of some constitutional compulsion applicable to civil actions the judicial function does not extend to this type of prison reform.

The practical difficulties presented by this case are far better resolved by action of the Legislature following that body's traditional study and debate. For example, as the majority apparently concede, courts simply cannot mandate the Department of Corrections to release a prisoner for purposes of attendance at civil trials. Further, there is no basis upon which courts can compel the Legislature to appropriate and expend public monies for the defense of purely private litigation. Similarly, it is doubtful that courts can indefinitely abate civil actions pending the release of a prisoner-party. The foregoing illustrate but a few of the numerous problems which must be resolved before the achievement of

that worthy goal of adequate participation in civil proceedings by *all* of our citizens.

The majority, relying upon the doubtful premise of a *constitutional* inadequacy, nonetheless, are emboldened to fashion a remedy which requires courts in civil actions either (1) to appoint counsel to serve "gratuitously" for an indigent prisoner or (2) to continue the cause for a reasonable period pending the prisoner's release, thus assuring his presence at trial. Preliminarily, it may be noted that under the majority's scheme the trial court even then does not fulfill its "constitutional" obligations solely by arranging with the Department of Corrections for the prisoner's personal appearance since to meet the majority's requirements even ". . . allowing a right of personal appearance is not an appropriate remedy for prisoners seeking to defend a civil action." (*Ante,* p. 923.)

The majority's main premise, however, that indigent prisoners possess a general "right of access" in the sense that they are entitled to free legal representation or their personal presence in civil courts, either or both, is incorrect under existing decisions of this state. Prisoners in California enjoy only a limited statutory degree of "access" to the courts. This conclusion is consistent with Penal Code section 2600 which provides that prisoners are deprived of only those rights ". . . necessary in order to provide for the reasonable security of the institution . . . and for the reasonable protection of the public." The right to appear personally in court is, of course, one which necessarily involves considerations of both institutional security and of public safety. Until now it had been assumed that a prisoner possessed no such right in civil actions. (*Wood* v. *Superior Court* (1974) 36 Cal.App.3d 811, 813 [112 Cal.Rptr. 157], and cases cited.) With respect to the asserted right to appointed counsel for prisoners in civil cases it is not accurate to say that prisoners are "deprived" of such a right, for under existing law even nonprisoner indigents have no abstract "right" to appointed counsel in ordinary civil matters. (*Hunt* v. *Hackett* (1973) 36 Cal.App.3d 134, 137-138 [111 Cal.Rptr. 456].)

The majority note the anomaly created by their requirement that indigent prisoners defending civil cases receive appointed counsel and/or a personal appearance while the indigent nonprisoner is assured of no such benefit. Thus, the prisoner is elevated above the law-abiding citizen. The Legislature has never seen fit to effect this startling result, and for good reason. In its reluctance, thus far, to assure prisoners a

"right" to counsel and presence in civil actions the Legislature need not ignore the fact that the reason for the prisoner's inability to attend trial is because of his intentional and wilful violation of the state's criminal laws and his subsequent conviction and confinement. Similarly, other adverse consequences follow from the prisoner's own conduct, self-induced. His constitutional right to travel, for example, is thereby inhibited. Part of the disparity between the remedies available to prisoner and nonprisoner indigents stems from the very nature of the criminal system, as expressed in Penal Code section 2600. The precise point was expressed recently by the United States Supreme Court in *Wolff* v. *McDonnell* (1974) 418 U.S. 539 [41 L.Ed.2d 935, 94 S.Ct. 2963], "Lawful imprisonment necessarily makes unavailable many rights and privileges of the ordinary citizen, a 'retraction justified by the considerations underlying our penal system.' [Citation.]" (P. 555 [41 L.Ed.2d p. 950].)

The majority's use of the term "right of access" to the courts, accordingly, must be understood in its proper perspective. Prisoners do have access to the courts. On the criminal side it is extensive. On the civil side it is much more limited.

The Legislature, however, has not entirely disregarded the rights of indigent prisoners in civil litigation. In 1975, enlarging upon the provisions of former section 2600 of the Penal Code, it established eight broad classes of civil rights of which the fourth is the right "to initiate civil actions." (Pen. Code, § 2601, subd. (e).) Furthermore, it has specifically provided that in actions involving deprivation of parental rights under Civil Code section 232 upon affidavit of a prisoner or his counsel "indicating the prisoner's desire to be present during the court's proceedings" the court shall order his production and may do so in other actions involving his parental or marital rights. (*Id.*, § 2625.) It is fair to conclude that the Legislature in its wisdom and for reasons satisfying to itself has declined, as yet, to go further in the matter of the prisoner's appearance in civil proceedings, and no precedent California case has required that it do so.

The majority, however, insist that ". . . the United States Supreme Court has long recognized a constitutional right to access to the courts for all persons, including prisoners. [Citations.]" (*Ante*, p. 914.) The assertion is made with more confidence than is warranted. None of the cases relied upon by the majority to support the foregoing generalization establish any right of prisoners to resort to the courts, either in person or through

appointed counsel in ordinary civil cases. Thus, close scrutiny discloses that *Procunier* v. *Martinez* (1974) 416 U.S. 396, 419 [40 L.Ed.2d 224, 243, 94 S.Ct. 1800], and *Johnson* v. *Avery* (1969) 393 U.S. 483 [21 L.Ed.2d 718, 89 S.Ct. 747], involved respectively prisoners' rights of access to law student and inmate legal assistance in preparing *habeas corpus petitions.* In *Cruz* v. *Beto* (1972) 405 U.S. 319, 321 [31 L.Ed.2d 263, 267-268, 92 S.Ct. 1079], the issue concerned the right to assert complaints regarding *prison conditions,* and *Price* v. *Johnston* (1948) 334 U.S. 266 [92 L.Ed. 1356, 68 S.Ct. 1049], dealt with the right orally to argue *a criminal appeal.* The high court in *Procunier* explained that the right of a prisoner's access to the courts is limited to proceedings ". . . to challenge unlawful convictions and to seek redress for violations of their constitutional rights." (P. 419 [40 L.Ed.2d p. 243].) Even more recently, in *Wolff* v. *McDonnell, supra,* 418 U.S. 539, the Supreme Court expressly observed that a prisoner's Fourteenth Amendment due process right of access to the courts ". . . has not been extended by this Court to apply further than protecting the ability of an inmate to prepare a [habeas corpus] petition or complaint [regarding prison conditions]." (P. 576 [41 L.Ed.2d pp. 962-963].) It seems quite clear to me that, under any United States Supreme Court decisions, old or new, petitioner's defense of a private tort action does not rise to a degree invoking Fourteenth Amendment protections.

The commendable goals of affording all of our citizens, whether entirely indigent or not, prisoners and nonprisoners alike, access to adequate counsel in civil cases are gaining the attention of legislative bodies, federal and state; thus the creation of Legal Services Corporation, federally funded to make more available and accessible competent legal assistance in the civil areas. But the much needed impetus toward affording more adequate and more widely distributed legal representation in civil litigation, comes from a growing awareness of a demonstrable social need and legislative and professional policy decisions implementing it, not from any Fourteenth Amendment compulsion.

The majority rely upon *Boddie* v. *Connecticut* (1971) 401 U.S. 371 [28 L.Ed.2d 113, 91 S.Ct. 780], as establishing a general right of free access to the civil courts in favor of all indigent persons including prisoners. *Boddie,* however, does not constitute authority for such a proposition. The *Boddie* court, on the contrary, implicitly limited the scope of its holding to actions brought *to dissolve a marriage.* (See, e.g., pp. 376-377, 380-381, fn. 8 [28 L.Ed.2d pp. 117-121].) The Supreme Court in the more

recent cases of *Ortwein* v. *Schwab* (1973) 410 U.S. 656 [35 L.Ed.2d 572, 93 S.Ct. 1172] (no free access to appellate courts) and *United States* v. *Kras* (1973) 409 U.S. 434 [34 L.Ed.2d 626, 93 S.Ct. 631] (no free access to bankruptcy courts) carefully explained that *Boddie* involved a special situation. In doing so, it furnished a sufficient answer to the majority's equal protection argument. Both *Ortwein* and *Kras* observed that in the area of "economics and social welfare" the compelling interest standard is inapplicable, and the state's action is measured by the less stringent "rational basis" test. It seems obvious that if, as in *Ortwein* and *Kras,* an indigent may *constitutionally* be denied free access to the courts to challenge a welfare reduction on the one hand, or assert a bankruptcy on the other, a fortiori the state may decline to provide prisoners free, legal representation and physical presence in the defense of personal injury suits.

The majority next insist that ". . . a number of courts have granted prisoners protective and assertive rights in civil actions." (*Ante*, p. 914.) The "number" consists, however, of two cited cases and neither is in point. In *Merchant's Adm'r.* v. *Shry,* 116 Va. 437 [82 S.E. 106, 108], a 1914 Virginia case, the court enforced a special state *statute* which provided for the creation of a committee to represent prisoners sued in state courts. Contrary to the majority's conclusion, this committee was a legislative device and not simply an "equitable solution" judicially created to assure due process. The other case, *Bagley* v. *Bagley* (1968) 57 Misc.2d 388 [292 N.Y.S.2d 796], involved a *divorce* action brought against a prisoner. The Supreme Court in *Boddie* has stressed that divorce proceedings represent a special situation, as previously noted, in which indigent persons are guaranteed access to civil courts. As we have observed the California Legislature has heretofore recognized this unique situation by its adoption of section 2625 of the Penal Code.

No other authorities are cited in support of the majority's proposal. The absence of any controlling or persuasive precedent, coupled with valid policy reasons, convinces me that we should leave in legislative hands the creation of new rights which are not of constitutional origin.

At present the average indigent must face civil litigation bereft of counsel. His recourse, in propria persona, is to seek help where he can find it. This is often difficult. Two principal sources are available to him. One is the membership of the organized bar which, pro bono publico, may respond free of charge or expense to the historic and compelling

professional call enunciated in Business and Professions Code section 6068, subdivision (h): "Never to reject, for any consideration personal to himself, the cause of the defenseless or the oppressed." Far more frequently than is generally known or accepted the profession has favorably responded to this ethical mandate. The indigent civil litigant also has access to legal aid societies where help may be available. Indigent prisoners are physically more isolated than nonprisoner indigents, but they may by mail also seek legal assistance, request continuances, file pleadings, motions and other legal papers. Judging by the number of criminal petitions flowing with regularity into the California court system, I think it is reasonable to conclude that these inmate rights are fairly well known among those affected. They may "testify" at hearings through use of depositions (see Code Civ. Proc., § 2016, subd. (d); Pen. Code, § 2623). Most importantly, no default judgment may be taken in a tort action, here involved, until the court first has heard the plaintiff's evidence and has determined that he should recover. (Code Civ. Proc., § 585, subd. 2; see also *Wilson* v. *Goldman* (1969) 274 Cal.App.2d 573, 576-577, fn. 1 [79 Cal.Rptr. 309]; Code Civ. Proc., § 117g [small claims court].)

Thus imprisonment does not totally deprive the indigent prisoner of all opportunity to reach the civil courts. Access is limited and does not achieve perfect equality with nonprisoners, which inequality is an incident of the prisoner's lawful confinement.

Other interesting questions remain unresolved by the majority's formulation, among them: What of the indigent *plaintiff* who, in propria persona, sues the indigent prisoner? Is he also entitled, because of due process and equal protection arguments, to court-appointed counsel to represent him free of charge in his civil action against the indigent prisoner who, under the majority's proposal, now has counsel? Who is to bear the cost of this additional increment of legal expense? Suppose the legal representation for either indigent nonprisoner plaintiff, or prisoner defendant is wholly inadequate or ineffective without an expert witness or extensive discovery? Is this to be afforded pro bono publico?

I note briefly certain incidents of the majority holding which requires appointment of counsel for indigent prisoner defendants in civil cases where a trial court concludes that "the prisoner's interests are actually at stake," and where "an attorney would be helpful." (*Ante*, p. 924.) As to the prisoner's physical presence, the trial court is to determine whether

his presence "is needed to protect the due process rights of the parties." If the court makes such a determination, then it may attempt to "arrange" for his presence or, if unsuccessful, order a continuance, record his testimony, and if feasible try the case, or a portion thereof, in prison. (*Ante*, p. 924.)

The foregoing procedural rules, judicially pronounced, although perhaps very loose in definition, impose upon trial courts a mandatory duty either to grant a continuance or to appoint counsel to represent, on a gratuitous basis, indigent prisoners who are defendants in civil suits. If the trial court concludes the prisoner's presence is "necessary" it should be "arranged" or the trial held in prison. It will be seen that two important professional and official responsibilities are invoked by the majority formulation: as to counsel—the organized bar and the practicing attorney; as to the prisoner's personal presence—the law enforcement and security agencies of the Department of Corrections and the local courts including judges, sheriffs, police, and marshals.

I do not know, and neither apparently do the majority, whether the number of criminal indigent civil defendants who would be affected by the majority's holding is large or small. The majority "doubt" that it would be large, noting the absence of any empirical evidence. They may be right or wrong, but this uncertainty alone, in my view, suggests the need for legislative inquiry first to trace the dimensions of the problem on the basis of facts not speculation, and then carefully to weigh the various alternatives. This is the procedure which has been successfully followed in analogous situations. Thus, in meeting the need for representation of criminal indigents, the *Legislature* adopted Penal Code sections 987.2, 987.3, 987.4, and 987.6, a carefully conceived plan for compensated representation. Similarly, when it became apparent that the appellate rights of the criminal indigents required consistent and adequate representation, again, the *Legislature* has very recently in the Government Code established the office of State Public Defender (Stats. 1975, ch. 1125) and carefully defined its duties and powers.

In the final analysis the majority will mandate the rendition of free legal service by the bar to convicted criminals in civil cases, which professional service we have not as yet required be extended to law-abiding citizens. The majority concede that we cannot compel appropriation of monies, legislative or otherwise, for these services. This

means that a large measure of *voluntary* cooperation will be required from the bar as to counsel. Similarly, depending upon the magnitude of the problem, law enforcement agencies are necessarily involved in any pronouncement, legislative or judicial, which requires the prisoner's personal presence. The cooperation of both affected groups is more likely to be achieved through their participation in legislative formulations in the traditional manner. A fair legislative solution of the problem of the indigent prisoner in civil actions doubtless will give appropriate consideration to the plight of the indigent *nonprisoner* and maintain a fair relationship between the two.

I make two final observations on the constitutional argument as to the requirement of counsel for indigent prisoners in civil actions. For many years the California public, the bench and the bar have lived with a very important procedural institution, the small claims court (Code Civ. Proc., § 117 et seq.). From its inception the Legislature has specifically *prohibited* any attorney from representing *either* party in civil litigation. (§ 117g.) The constitutionality of such procedures has long been accepted. (*Prudential Ins. Co.* v. *Small Claims Court* (1946) 76 Cal.App.2d 379, 384 [173 P.2d 38, 167 A.L.R. 820].) Do different *constitutional* considerations suddenly arise when the civil claim exceeds the frequently changing jurisdictional limits of the small claims court? Further, when a civil litigant appears in propria persona at trial he may be asked by the court or counsel if he has an attorney, but to my knowledge he is rarely if ever asked to *waive* the services of counsel, which would surely be required if the litigant had a *constitutional* right to counsel in civil matters.

The majority of this court in *In re Tucker* (1971) 5 Cal.3d 171 [95 Cal.Rptr. 761, 486 P.2d 657], rejected a parolee's due process contention that he was entitled to counsel at parole revocation proceedings. (*Tucker* preceded *Gagnon* v. *Scarpelli* (1973) 411 U.S. 778 [36 L.Ed.2d 656, 93 S.Ct. 1756], which provided a limited right to counsel in these proceedings.) Addressing a vigorous and extended dissent which argued that the presence of counsel was necessary to meet due process and equal protection requirements, the concurring opinion of this court gently chiding the dissent for "tripping over reality" (p. 180) soundly emphasized the logistical problems thereby imposed. It further identified a far larger goal circumscribed by very practical considerations in recognizing that "as an ideal a skilled member of the bar should either be available

for hire or provided out of the public treasury for every adult and every juvenile with a *civil* or *criminal* problem that has the slightest potential of subjecting him to physical detention, *monetary loss* or moral humiliation. The day may come when there is an adequate lawyer population and sufficient public sophistication to achieve that ideal. I regret, perhaps more than my dissenting brethren who fail to consider the problem of logistics, that the day does not yet appear on the horizon. Nor will it be hastened by judicial fiat." (P. 181, italics added.) The concurring opinion then stressed that of the possible solutions "[T]he third alternative, necessary for the present, is to avoid judicially extending the required presence of hired or appointed counsel beyond the areas compelled by the Constitution. At such time as the numerous practical problems appear ripe for solution, primarily the availability of attorneys in sufficient numbers, we can anticipate adoption of appropriate procedure *by the Legislature.*" (P. 184, italics added.)

I fully share in these practical expressions of caution and restraint and note that those wise observations, expressed in concurrence in the context of a criminal case, have even greater force when, as here, the criminal indigent faces not the heavy onus of *criminal* sanctions but the lesser burden of a *civil* judgment. In a similar vein they continue to remind us, notwithstanding the passage of five years, that while searching for commendable policy goals we will do well to pay frequent attention to the uneven ground over which we must pass in reaching them, relying always on the *Legislature* to play its appropriate part in the process.

I do not agree that the Fourteenth Amendment rights of a criminal indigent have been violated by denying him free counsel in, or attendance at, the defense of a *civil* action. I do agree, however, with the following principles, applicable to prisons and prisoners generally, recently enunciated by the United States Supreme Court in *Procunier* v. *Martinez, supra,* 416 U.S. 396: "Suffice it to say that the problems of prisons in America are complex and intractable, and, more to the point, they are not readily susceptible of resolution by decree. Most require expertise, comprehensive planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government. For all of those reasons, courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform. Judicial recognition of that fact reflects no

more than a healthy sense of realism." (Pp. 404-405, fn. omitted [40 L.Ed.2d pp. 235-236].)

I would deny the writ.

McComb, J., and Clark, J., concurred.