Filed 8/6/19

### CERTIFIED FOR PARTIAL PUBLICATION[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| GREGORY SMITH,<br><br>  Plaintiff and Appellant,<br><br> v.<br><br>I. OGBUEHI et al.,<br><br>  Defendants and Respondents. | F075882<br><br>(Super. Ct. No. 13CECG03237)<br><br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Fresno County.  Donald S. Black, Judge.

Gregory Smith, in pro. per., for Plaintiff and Appellant.

Xavier Becerra, Attorney General, Monica N. Anderson, Assistant Attorney General, Neah Huynh and Allison M. Low, Deputy Attorneys General, for Defendants and Respondents.

-ooOoo-

Plaintiff Gregory Smith is an indigent, self-represented prison inmate pursuing medical malpractice claims against a doctor and a nurse practitioner employed by the Pleasant Valley State Prison (Pleasant Valley).  He filed a motion for the appointment of counsel, arguing the trial court should consider (1) the factual complexity of the issues

---

[*]     Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of part II. of the Discussion.

relating to pain medication, dosage and his spinal condition; (2) his limited ability to investigate the facts, obtain discovery and get expert witnesses; (3) the legal complexity of the case; and (4) his showing that, on their face, his claims had merit. The trial court noted the right of criminal defendants to appointed counsel, cited the statute governing the appointment of public defenders, but stated it was without authority to appoint an attorney for a plaintiff in a civil case, and denied the motion. Subsequently, the trial court granted defendants' motion for summary judgment because Smith, as he predicted, did not obtain a medical expert's declaration contradicting the opinion of defendants' expert that the care provided Smith met the applicable standard of care.

The California Constitution and Penal Code section 2601, subdivision (d) provide indigent prisoners with the right of meaningful access to the courts to prosecute civil actions. One of the discretionary measures available to protect the right of access to the courts is the appointment of counsel. Consequently, the trial court had the discretionary authority to appoint counsel. The court's statement that it was without the authority to appoint counsel did not recognize the existence and scope of its discretionary authority.

The exercise of a trial court's discretion is guided by a three-step inquiry established in published appellate decisions. (*Apollo v. Gyaami* (2008) 167 Cal.App.4th 1468, 1485–1487 (*Apollo*); *Wantuch v. Davis* (1995) 32 Cal.App.4th 786, 792 (*Wantuch*).) First, the trial court determines whether the prisoner is indigent. Second, the court determines whether the lawsuit involves a bona fide threat to the inmate's personal or property interests. If both conditions are satisfied, the trial court must consider the measures available to protect appellant's right of meaningful access to the courts, including the appointment of counsel. Where the indigent prisoner's civil action is bona fide and his or her access to the court is being impeded, a trial court must provide a remedy; it may not choose to do nothing.

Here, the trial court's denial of the motion to appoint counsel was not based on an informed exercise of its discretion. Consequently, the appropriate remedy is to remand

2.

the matter to the trial court for an exercise of its discretionary authority within the framework of the three-step inquiry.

We publish a portion of this decision because it resolves issues not reached in *Apollo* or *Wantuch*. First, the discretionary appointment of an expert pursuant to Evidence Code section 730 is among the measures available to trial courts to ensure indigent prisoner litigants are afforded meaningful access to the courts. Second, trial courts are responsible for recognizing their discretionary authority to appoint counsel for indigent civil litigants who request the appointment of counsel, even when the indigent litigant does not cite cases such as *Apollo* and *Wantuch* and does not refer to the right of access to the courts as the basis for that discretionary authority. Third, an indigent civil litigant may argue on appeal that the right of meaningful access to the courts provides a basis for appointing counsel despite not raising that specific argument in the trial court.

We therefore reverse the judgment and remand for further proceedings.

## FACTS

*Parties*

Smith was born in 1956. His present incarceration began in 2004 and he is serving a sentence of 39 years to life, with eligibility for parole. The present litigation arises from the medical care Smith received at Pleasant Valley, where he arrived in August 2011, after being transferred from the Richard J. Donovan Correctional Facility in San Diego County (Donovan). Smith remained at Pleasant Valley until December 2013, when he was transferred to Folsom State Prison (Folsom).

The defendants named in Smith's pleading were P. Brazelton, Warden of Pleasant Valley; Dr. U. Baniga; Nurse Practitioner I. Ogbuehi; J. Clark Kelso; Dr. A. Duenas; and L. Zamora. Only Dr. Baniga, Ogbuehi, and Warden Brazelton were served with Smith's amended complaint.

3.

Prior to Smith's arrival at Pleasant Valley, he was injured in two separate cellmate assaults. After the first cellmate assault, medical staff at Donovan coordinated two surgeries on Smith's right thumb and wrist in 2008 and 2009. Donovan medical staff also prescribed gabapentin for pain.

In June 2010, Smith experienced a sudden onset of right knee pain. Donovan medical staff identified a lateral meniscus tear and preliminarily evaluated Smith for surgery.

In September 2010, the second cellmate assault occurred, injuring Smith's left shoulder. Donovan medical staff and Smith prioritized treatment of the injured shoulder over the treatment of Smith's knee. In September 2010, the first surgery on Smith's left shoulder was conducted. In February 2011, Donovan medical staff coordinated a second surgery on Smith's shoulder to remove the displaced anchor. Donovan medical staff also prescribed morphine for pain.

While treating Smith's shoulder, a CT scan revealed an old compression fracture of Smith's L3 vertebrae. Smith was given a back brace, but no significant treatment was provided for his back.

To summarize, while at Donovan, Smith experienced medical problems with his right hand, right knee, left shoulder, and his spine. The symptoms from these problems included pain. This lawsuit addresses the medical care Smith received at Pleasant Valley after leaving Donovan in August 2011. Details about that medical care are set forth in the unpublished portion of this opinion addressing defendants' motion for summary judgment.

## PROCEEDINGS

Smith has represented himself throughout this proceeding, which has included exhausting administrative remedies, filing a claim under the Government Claims Act (Gov. Code, § 810 et seq.), and pursuing this lawsuit. The litigation began in October

4.

2013 when Smith filed a civil complaint and an application for waiver of court fees. In April 2014, after various motions had been filed and some withdrawn, Smith filed an amended complaint asserting medical malpractice claims. His amended complaint is the operative pleading for purposes of this appeal.

The amended complaint sets forth headings for three causes of action, all of which included the description "(Negligent or Wrongful Act or Omission)." Additional descriptions of "(Defendant's owe Plaintiff a legal duty of care)"; "(Defendant's Breach of Duty)"; and "(Proximately Cause Pain and Suffering)" were included in Smith's headings for the first, second, and third causes of action, respectively.

In broad terms, Smith alleged defendants breached their legal duty to provide reasonable and competent medical care by failing to give necessary medication; prescribing inappropriate medication; delaying examination and treatment; and failing to provide access to a specialist that his particular condition required. He also alleged the "failure to summon immediate medical care … is serious enough [to] amount to the wanton and unnecessary infliction of pain and suffering." In more specific allegations, Smith asserts his shoulder cannot be repaired due to delays in treatment; the morphine he was taking for pain was inappropriately lowered and then withdrawn completely; the gabapentin he was taking was inappropriately withdrawn; and Dr. Baniga refused his request to be removed from Ogbuehi's care and assigned another nurse practitioner. The pain being treated related to Smith's shoulder injury, a compression fracture of his L3 vertebrae, and a tear of the lateral meniscus in his right knee.

In June 2014, the three defendants served with the amended complaint filed their answer. Subsequently, Warden Brazelton was dismissed with prejudice pursuant to a written request for dismissal signed by Smith and defense counsel. Consequently, this lawsuit has been narrowed to the claims against Dr. Baniga and Ogbuehi.

*Motion for Appointment of Counsel*

In April 2015, Smith filed a motion for appointment of counsel. The motion asserted (1) Smith was unable to afford counsel; (2) the issues involved in the case were complex and would require medical expert testimony; (3) Smith had little or no access to drug manufacturers and their data, specialists of the spine, or the Food and Drug Administration; and (4) Smith had limited knowledge of the law. Smith's memorandum of points and authorities cited federal cases and discussed factors addressed in those opinions—namely, factual complexity, plaintiff's ability to investigate, plaintiff's ability to present his claim, legal complexity, and the merits of the case.

In May 2015, the trial court issued an order (1) stating it had received Smith's ex parte motion for appointment of counsel, (2) mentioning the right to appointed counsel in criminal cases and lack of authority to appoint counsel for a plaintiff in a civil proceeding, and (3) denying the request. The court's rationale is described in part I.B.2., *post*.

*Motion for Summary Judgment*

In December 2016, defendants filed a motion for summary judgment asserting "the undisputed material facts establish that Nurse Practitioner Ogbuehi and Dr. Baniga's provision of medical services to [Smith] did not fall below the standard of care." The separate statement of undisputed material facts was organized into 10 sections that addressed plaintiff's (1) shoulder condition, (2) back condition, (3) knee condition, (4) morphine prescription, (5) gabapentin prescription, (6) oxcarbazepine prescription, (7) amitriptyline claims, (8) request for a new provider, (9) causal link, and (10) the lawsuit. The motion was supported by declarations of a medical expert and a deputy attorney general. Ogbuehi and Dr. Baniga did not submit declarations to support their motion for summary judgment.

6.

*Dr. Duenas's Declaration*

Defendant's medical expert, Dr. A. Duenas received a Doctor of Medicine degree from the Universidad Autonoma de Guadalajara School of Medicine in 1979. She is certified in internal medicine by the American Board of Internal Medicine. Dr. Duenas began working for the California Department of Corrections and Rehabilitation in 2008 and remained in its employ through the date of her declaration. She was serving as the chief physician and surgeon at the Pleasant Valley State Prison when Smith arrived and continued in that role until February 2012, when she transferred to another institution.[1]

Dr. Duenas's opinion on the adequacy of medical care provided to Smith by Dr. Baniga and Ogbuehi was based on (1) her review of medical records of the care provided to Smith during his incarceration from 2004 through the date of her declaration; (2) her direct participation in Smith's case while chairing the Clinical Case Management Review Committee, which evaluated Smith on January 11, 2012; (3) the administrative grievance filed by Smith relating to care given by Ogbuehi, which Dr. Duenas granted in part at the second level of review and initiated a confidential staff inquiry;[2] (4) her review of nonmedical records provided by defense counsel and included in the papers supporting the motion for summary judgment; and (5) her professional experience, training, and knowledge. Dr. Duenas's declaration set forth her "professional opinion that Ogbuehi and Dr. Baniga's medical practices met applicable standards of care. Further, it is my professional opinion, to a degree of medical probability, that no action or inaction by Nurse Practitioner Ogbuehi or Dr. Baniga caused plaintiffs claimed harm." These

---

[1] Dr. Duenas, a named but unserved defendant, was dismissed from the lawsuit without prejudice in 2015. Thus, her opinion addresses the conduct of her subordinates.

[2] Inmate grievances are processed in accordance with regulations set forth in article 8 of title 15 of the California Code of Regulations. The three levels of administrative review applied to the grievances are discussed by this court in *Villery v. Department of Corrections & Rehabilitation* (2016) 246 Cal.App.4th 407 and *Menefield v. Foreman* (2014) 231 Cal.App.4th 211.

opinions were supported by the details set forth and analyzed in paragraphs 14 through 93, inclusive, of her declaration, which covered approximately 25 pages.

Here, we set forth some of Dr. Duenas's views about the treatment of Smith's left shoulder and Smith's allegations relating to that treatment. Dr. Duenas states Smith is wrong in claiming that the delays by Dr. Baniga or Ogbuehi delayed the surgery and caused his supraspinatus tendon tear to be unrepairable. Dr. Duenas states: "The date upon which the tendon could have been accessible in surgery before retraction is not known." She notes Dr. Y. N. Paik of the Pacific Orthopedic Medical Group did not call for immediate surgery after his February 2012 consultation with Smith or his May 2012 evaluation and then states the following opinion: "Plaintiff cannot establish that surgery would have been successful prior to August 1, 2012—in fact, plaintiff cannot establish that surgery would have been successful prior to his initial evaluation by Ogbuehi in October 2011."

*Opposition*

On April 27, 2017, Smith filed a response to defendants' separate statement of undisputed material facts, which included exhibits totaling over 120 pages.[3] The proof of service attached to this response refers to a declaration of Smith in opposition to defendants' motion, but such a declaration does not appear in the appellate record.

Smith responded "undisputed" to many of the 130 numbered paragraphs of material facts asserted by defendants. However, Smith also responded "disputed" to many of the assertions of fact. For example, defendants' separate statement described an October 25, 2011, meeting between Smith and Ogbuehi and a January 11, 2012, meeting

---

[3] The tentative ruling on the motion for summary judgment was issued on April 11, 2017, so the trial court did not have the benefit of Smith's response when it made its tentative decision, which was later adopted on April 27, 2017, following an unreported hearing held that day. The record does not show whether the trial court had actually seen Smith's response before or during the hearing.

between Smith and the Clinical Case Management Review Committee, stating the main source of Smith's pain was his shoulder. Smith disputes these statements and asserts he was suffering pain in his left shoulder, lower back pain and right knee pain, but the left shoulder pain was the only complaint with which the nurse and committee were concerned.

Another example of a factual dispute relates to paragraph 37 of defendants' separate statement, which described excerpts of Smith's medical records relating to his back condition. In his response, Smith disputed "the accuracy of these medical records." The accuracy of Smith's medical records also was addressed in paragraph 124 of defendants' separate statement, which asserted Smith was asked during his deposition if the medical records he reviewed accurately reflected *the medical treatment he received*,[4] and he answered "yes."

In the section of defendants' separate statement addressing Smith's back condition, paragraphs 41, 45, 47, 48, 50, 51, 52, 54 and 56 describe nine meetings between Smith with Ogbuehi between June 2012 and December 2013. Those paragraphs assert the medical records reflect Ogbuehi evaluated Smith and reported "a negative straight leg raise test." Smith disputes the completeness and correctness of the leg raise test performed, stating he was never on his back for the test and Ogbuehi never raised his leg herself. Smith asserts that, instead, he was asked to raise one leg at a time while seated in a chair. Smith notes there was no documentation on how the test was performed and states, "same incorrect procedures month after month, same incorrect results." Smith supported his claim that the test was performed incorrectly by submitting

---

[4]     Defendants' separate statement did not address whether Ogbuehi's notes accurately reflected her conversations with Smith.

a printout of an article on the straight-leg test for evaluating low back pain from *Web*MD.[5]

In the part of defendants' separate statement addressing Smith's morphine prescription, defendants refer to medical records from a January 9, 2013, meeting between Smith and Ogbuehi for a primary care evaluation and state the records reflect Ogbuehi noted a "steady gait." Smith's response asserts this statement by Ogbuehi was false and misleading because a steady gait was never proven and she "never walk[ed] with plaintiff to see how his walk is." Smith supports his assertion by referring to medical records describing him as walking into a "room with a significant gait limping, using his cane."

Smith's response to defendants' separate statement disputes other factual assertions made by defendants. Those disputes are not described here as the foregoing examples are sufficient for purposes of this appeal.

*Trial Court's Decision*

On April 27, 2017, a hearing was held on the motion for summary judgment, the same day Smith's response to defendants' separate statement was filed. Smith and defense counsel appeared using CourtCall. The court granted the motion, adopting its tentative ruling as its order, previously issued on April 11, 2017. The ruling stated defendant had met their burden by showing that nothing Ogbuehi or Baniga did caused Smith's harm. The court referred to Dr. Duenas's opinion that defendants' medical practices met the applicable standards of care and stated the medical records showed that Dr. Baniga did not refuse Smith's request to be assigned to a different medical provider.

---

**5** Smith's response to defendants' separate statement was filed on April 27, 2017, well after Dr. Duenas executed her declaration on December 13, 2016. Dr. Duenas did not anticipate Smith's claim that the straight-leg test was performed incorrectly and, therefore, did not address (1) how to perform a straight-leg test in accordance with the applicable standard of care or (2) the manner in which Ogbuehi performed the test.

In May 2017, the trial court entered a judgment in favor of Ogbuehi and Dr. Baniga in the amount of $1,330.13 and decreed that Smith would take nothing. Smith filed a timely appeal.

## DISCUSSION

### I.    APPOINTMENT OF COUNSEL

Appellant's opening brief included a heading asserting the denial of appointment of counsel *for medical expert* was an abuse of discretion. Because his request of the trial court was for appointment of counsel, not for the appointment of an expert, our review focuses on the issues relating to the appointment of counsel. Under California law, the appointment of counsel for an indigent prisoner pursuing a civil action is an aspect of the right of access to the courts. (*Apollo*, *supra*, 167 Cal.App.4th at p. 1484, citing *Yarbrough v. Superior Court* (1985) 39 Cal.3d 197, 200–201 (*Yarbrough*).) Accordingly, an overview of the principles that define the right to access to the courts is provided.

#### A.    <u>Overview of Right to Access to the Courts</u>

##### *1.    General Principles*

Access to the courts is "a right guaranteed to all persons by the federal and state Constitutions." (*Jersey v. John Muir Medical Center* (2002) 97 Cal.App.4th 814, 821.)[6] The constitutional right of access to the court extends to prisoners. (*In re Jesusa V.* (2004) 32 Cal.4th 588, 601 ["there is no dispute that prisoners have a constitutional right of access to the courts"].) In addition to these constitutional foundations, California state prisoners have the statutory right "[t]o initiate civil actions" as plaintiffs. (Pen. Code, § 2601, subd. (d).) This statute has been interpreted "to include within its scope the right to

---

[6]    The United States Supreme Court has "grounded the right of access to court in the Article IV Privileges and Immunities Clause [citations], the First Amendment Petition Clause [citations], the Fifth Amendment Due Process Clause [citations], and the Fourteenth Amendment Equal Protection [citation] and Due Process Clauses [citations]." (*Christopher v. Harbury* (2002) 536 U.S. 403, 415, fn. 12; cf. Cal. Const., art. I, § 3, subd. (a) ["people have the right to … petition government for redress of grievances"].)

be afforded meaningful access to the courts to *prosecute* those civil actions." (*Apollo*, *supra*, 167 Cal.App.4th at p. 1483, italics added.) Under this statute, "a prisoner may not be deprived, by his or her inmate status, of meaningful access to the civil courts if the prisoner is both indigent and a party to a bona fide civil action threatening his or her personal or property interests." (*Ibid*., citing *Wantuch*, *supra*, 32 Cal.App.4th at p. 792.)

The decisions in *Apollo* and *Wantuch* are significant because they involved indigent prisoners who were *plaintiffs* in civil actions. Earlier decisions of the California Supreme Court addressing the right of access to the courts dealt with indigent prisoners who were *defendants* in civil actions. (See *Yarbrough, supra,* 39 Cal.3d 197; *Payne v. Superior Court* (1976) 17 Cal.3d 908 (*Payne*).)

In *Wantuch*, a self-represented inmate sued his former criminal defense attorney for malpractice and other causes of action. (*Wantuch*, *supra*, 32 Cal.App.4th at pp. 789–790.) When the inmate failed to appear at a status conference, the trial court denied the inmate's motion for appointed counsel, struck his pleadings, and entered judgment against him. (*Id*. at p. 790.) The Second District determined the trial court abused its discretion in striking the pleadings and entering judgment against the inmate. (*Ibid*.) The court reversed the judgment and remanded for further consideration of the inmate's right of access to the courts. (*Wantuch*, *supra*, 32 Cal.App.4th at pp. 790, 795–796.)

In *Apollo*, a self-represented prisoner brought a civil action against the prison food administrator and two medical staff members for damages resulting from defendants' refusal to provide a medically prescribed special diet for his chronic diverticulitis of the colon. (*Apollo*, *supra*, 167 Cal.App.4th at p. 1471.) Two defendants obtained a dismissal for lack of proper service and the other prevailed on a motion for summary judgment. (*Ibid*.) On appeal, the prisoner challenged the dismissals and the entry of summary judgment and, as an initial matter, argued he had been denied his right of meaningful access to the courts based on his status as an indigent, unrepresented prisoner litigant. (*Id*. at p. 1482.) The First District regarded the prisoner's access to the courts as the

12.

crucial issue in the case, reversed the judgment, and remanded for further proceedings on the question of his right of meaningful access.  (*Id*. at pp. 1482, 1488.)

In *Apollo*, the First District's analysis of the potential deprivation of meaningful access to the courts followed the reasoning set forth in *Wantuch*.  The court stated it "must determine whether, considering appellant's status as an unrepresented prisoner-litigant, the trial court exercised its discretion in a manner protective of his statutory right to meaningful access to the courts to prosecute bona fide civil claims." (*Apollo*, *supra*, 167 Cal.App.4th at p. 1484.)  The court reviewed the record presented and determined the trial court gave little, if any, consideration to the appellant's right of meaningful access to the courts.  (*Id*. at p. 1485.)  Consequently, the First District remanded for further proceedings and directed the trial court to (1) "first determine whether appellant is indigent"; (2) next determine whether the lawsuit involved a bona fide threat to his personal or property interests, and (3) consider what measures were available to protect appellant's right of meaningful access to the courts if the first two conditions (i.e., indigency & bona fide claim) existed.  (*Id*. at pp. 1485–1486.)  This three-step inquiry was based on the remand instructions given in *Wantuch*.  (*Wantuch*, *supra*, 32 Cal.App.4th at p. 796.)

A nonexclusive list of measures available to trial courts to ensure indigent prisoner litigants are afforded meaningful access to the courts (including plaintiffs in bona fide civil actions) are set forth in both *Apollo* and *Wantuch*.  Those measures included (1) deferral of the action until the prisoner is released; (2) *appointment of counsel for the prisoner*; (3) transfer of the prisoner to court to attend hearings or the trial; (4) utilization of depositions in lieu of personal appearances; (5) holding of trial in prison; (6) conducting status and settlement conferences, hearings on motions and other pretrial proceedings by telephone; (7) propounding of written discovery; and (8) use of closed circuit television or other modern electronic media.  (*Apollo*, *supra,* 167 Cal.App.4th at p. 1483, quoting *Wantuch*, *supra*, 32 Cal.App.4th at pp. 792–793.)  This list also allows for

13.

the " 'implementation of other innovative, imaginative procedures.' "[7] (*Apollo, supra,* at p. 1483.)  In deciding the appropriate measure or measures to assure access, the relevant circumstances include, without limitation, the practicality and effectiveness of the various measures available to protect the right of access to the courts.  (See *Wantuch*, *supra*, 32 Cal.App.4th at p. 793.)

After the briefing in this appeal was completed, the California Supreme Court decided a case involving the right of access to the courts of an indigent plaintiff prisoner pursuing medical malpractice claims.  (*Jameson v. Desta* (2018) 5 Cal.5th 594 (*Jameson*).)  In that case, the right to access to meaningful appellate review of the trial court's decision was affected by the absence of a court reporter at the trial court proceedings and the resulting lack of a verbatim record of those proceedings.  (*Id*. at p. 608.)  As background, the Supreme Court described various ways it and the Courts of Appeal had protected the ability of indigent civil litigants to obtain meaningful access to the courts, including "*Payne*[*, supra,*] 17 Cal.3d 908 [132 Cal.Rptr. 405, 553 P.2d 565] … [right of indigent prisoner who is a defendant in a civil case to be provided meaningful access to judicial process, including representation by counsel if necessary]; *Yarbrough*[*, supra,*] 39 Cal.3d 197 [216 Cal.Rptr. 425, 702 P.2d 583] [explaining trial court's responsibilities under *Payne*]."  (*Jameson*, *supra*, 5 Cal.5th at p. 605.)  Based on our Supreme Court's citation of its prior decisions involving the appointment of counsel, we conclude those decisions remain good law.  Although *Apollo* and *Wantuch* were not cited in *Jameson*, we conclude the analysis and the result reached in *Jameson* supports the conclusion that the Supreme Court did not overrule those cases by implication.

---

**7**     We have located, and the parties have cited, no published decision explicitly including or excluding the discretionary appointment of an expert pursuant to Evidence Code section 730 from the measures available to protect the right of access to the courts. Here, we explicitly decide this apparently novel question and conclude the discretionary appointment of an expert pursuant to Evidence Code section 730 is among the measures a trial court *may* consider.

Therefore, we conclude *Apollo* and *Wantuch* remain good law on the subject of an indigent prisoner's right to meaningful access to the courts.

## 2. *Appointment of Counsel*

California decisions identify the appointment of counsel as one of the measures available to a trial court to assure an indigent prisoner is provided meaningful access to the courts. However, neither the California Constitution nor Penal Code section 2601, subdivision (d) have been interpreted to require the appointment of counsel for indigent plaintiff litigants *as a matter of right*. (*Apollo*, *supra*, 167 Cal.App.4th at p. 1483 [while appointment of counsel for a prisoner is a measure for affording meaningful access to the courts, the right does not necessarily mandate a particular measure such as the appointment of counsel].)[8] Instead, the choice of measures to safeguard a prisoner's right, as a plaintiff or defendant, to meaningful access to the courts to prosecute a civil action is committed to the trial court's discretion. (*Apollo*, *supra*, at pp. 1483–1484; see 3 Mushlin, Rights of Prisoners (5th ed. 2017) § 12:24, p. 221 [in almost all cases where a self-represented inmate requests counsel, "the issue will be whether the court should exercise its discretion to appoint counsel"].) The scope of that discretionary authority is defined in part by the following:

> "[A] trial court does not have discretion to choose *no remedy* in cases where the prisoner's civil action is bona fide and his or her access to the courts is being impeded. Indeed, the California Supreme Court has suggested that, in certain cases, appointment of counsel may be the *only remedy* available to protect a prisoner litigant's right of meaningful court access: 'In an appropriate case, and as a last alternative, appointment of counsel may be the only way to provide an incarcerated, indigent civil defendant with access to the courts for the protection of threatened personal

---

[8] The same is true of the United States Constitution and the federal statute, even when the lawsuit alleges violations of constitutionally protected rights. (*Jackson v. Dallas Police Dept.* (5th Cir. 1986) 811 F.2d 260, 261 (*Jackson*).)

15.

and property rights.' (*Yarbrough*, *supra*, 39 Cal.3d at pp. 200–201.)"
(*Apollo*, *supra*, 167 Cal.App.4th at p. 1484.)[9]

Another aspect of the discretionary authority relates to how a trial court should balance the right of meaningful access to the court against the important principles that (1) indigent litigants "are entitled to the same, but no greater, rights than represented litigants" and (2) "trial courts have a duty in the name of public policy to expeditiously process civil cases." (*Apollo*, *supra*, 167 Cal.App.4th at p. 1487.)  The First District stated these important principles "must yield to the even greater principles of providing in propria persona litigants with meaningful access to the courts and of deciding bona fide civil actions on their merits." (*Apollo*, *supra*, at p. 1487.)

### 3. Federal Approach to Appointing Counsel

Smith's motion for the appointment of counsel did not cite a decision by any court of the State of California.  Instead, he cited federal decisions.  (See *Moore v. Mabus* (5th Cir. 1992) 976 F.2d 268, 272 [reversed denial of motion for appointment of counsel for indigent plaintiff alleging constitutional violations, stating "district court should promptly appoint qualified counsel"]; *Terrell v. Brewer* (9th Cir. 1991) 935 F.2d 1015, 1017 [district court's denial of motion for appointment of counsel pursuant to 28 U.S.C. § 1915 reviewed for an abuse of discretion]; *McKeever v. Israel* (7th Cir. 1982) 689 F.2d 1315, 1319 [district court failed to exercise its discretion under 28 U.S.C. § 1915(d) because it did not recognize its authority to appoint counsel for plaintiff].)  Because of the overlap between the federal and state constitutional rights to meaningful access to the courts, we briefly summarize the federal decisions.

The federal statute authorizing prisoners to bring civil actions in forma pauperis provides that "[t]he court may request an attorney to represent any person unable to

---

[9]     In *Yarbrough*, the Supreme Court stressed the distinction between the discretion to appoint counsel and the lack of authority to order the payment of public funds to compensate such appointed counsel for indigent prisoners in civil actions.  (See *Apollo, supra*, 167 Cal.App.4th at p. 1484, fn. 12.)

afford counsel." (28 U.S.C. § 1915(e)(1).) As stated in the cases cited by Smith, this provision grants federal district courts the *discretionary authority* to appoint counsel for indigent civil plaintiffs. However, appointment of counsel is not simply a matter of routine. Many federal courts have interpreted this provision to authorize the appointment of counsel for indigent civil litigants when "exceptional circumstances" exist. (E.g., *Byrd v. Maricopa County Board of Supervisors* (9th Cir. 2017) 845 F.3d 919, 925; *Jackson, supra,* 811 F.2d at p. 261 ["district court is not required to appoint counsel unless the case presents 'exceptional circumstances' "]; see 3 Mushlin, Rights of Prisoners, *supra*, § 12:24, p. 230, fn. 34.) In determining the existence of exceptional circumstances, federal district courts consider "(1) the type and complexity of the case; [¶] (2) whether the indigent is capable of adequately presenting his case; [¶] (3) whether the indigent is in a position to investigate adequately the case; … [¶] (4) whether the evidence will consist in large part of conflicting testimony so as to require skill in the presentation of evidence and in cross examination" and (5) "whether appointed counsel would aid in the efficient and equitable disposition of the case." (*Jackson*, *supra*, 811 F.2d at p. 262.)

### 4. Relevant Circumstances

The next two legal questions we resolve relate to the trial court's determination of whether an inmate's "access to the courts is being impeded." (*Apollo*, *supra*, 167 Cal.App.4th at p. 1484.) First, we conclude the determination of whether access is being impeded is committed to the trial court's discretion. This determination is intertwined with the question of the appropriate remedy or remedies to secure meaningful access because the resolution of each often will involve an evaluation of the same facts and circumstances. (See *Wantuch*, *supra*, 32 Cal.App.4th at p. 793 [factors to be considered in determining appropriate remedy to secure access].) Therefore, it is internally consistent to treat both inquiries as committed to the trial court's discretionary authority.

Second, we conclude a trial court must examine the totality of the circumstances when making the discretionary determination of whether an inmate's access is being impeded. It follows that the relevant circumstances include, without limitation, the factors listed in the federal decisions for determining whether exceptional circumstances exist in a particular case.[10] Accordingly, trial courts should consider those factors when weighing the totality of the circumstances before deciding whether an inmate's access to the courts is being impeded.

B. Smith's Motion and Its Denial

1. *Smith's Arguments*

Smith's motion for the appointment of counsel did not refer to the constitutional and statutory right of access to the courts and did not cite *Apollo*, *Wantuch*, or any other California decision. Instead, Smith relied on federal cases and asserted the trial court should consider the factual complexity of the case; the ability of the inmate to investigate the facts; the ability of the inmate to get discovery and expert witnesses; and the complexity of the legal issues. Smith argued the issues involving his medical condition and need for pain medication were factually complex and probably would require him to present a medical expert witness, cross-examine any expert witnesses called by defendants, or both. Smith stated he had no ability to investigate medical data on drugs, spinal stenosis, or its treatment. Smith argued the appointment of counsel was supported

---

**10** Defendants' supplemental brief asserts: "Neither Mr. Smith's pro-per nor incarcerated status barred him from sourcing his own expert. Identically situated individuals have surpassed both hurdles." Defendants support this assertion by citing *Jameson, supra,* 215 Cal.App.4th at page 1149 (inmate presented expert testimony that doctor's breach of the standard of care caused inmate to receive numerous unnecessary injections of interferon, which a jury could find was painful and inherently injurious). The fact a reported decision shows a self-represented inmate was able to obtain a medical expert in a particular malpractice action may establish context for the issue, but it is not evidence tending to prove Smith is capable of obtaining his own expert and, thus, is not directly relevant to whether Smith's right to access is being impeded.

18.

by the fact that he was an indigent inmate who did not complete high school and had no legal training. Smith stated presenting his legally complex medical malpractice claims to a jury required greater skill than he had or could develop. In addition, he argued his claims had sufficient merit on their face to weigh in favor of appointing counsel.

### 2. *The Trial Court's Decision*

The trial court's written order denying Smith's ex parte motion for the appointment of counsel stated Smith had "failed to provide any authority that would support the request that this court appoint an attorney in this civil action." The court noted the constitutional right to counsel for criminal defendants and the establishment of the office of the public defender to provide that representation. The court referred to Government Code section 27706 as setting forth the grounds for appointing the public defender and concluded none of those grounds were present in this case. The court then reiterated that "[t]he authority cited by [Smith] has no application to this case" and concluded it was "without authority to appoint an attorney in this case." As a result, the court denied Smith's motion.

### C. Arguments Presented on Appeal

### 1. *Initial Appellate Briefing*

Smith's opening brief contends the "denial [of] appointment of counsel for medical expert" was an abuse of discretion. Defendants contend the trial court did not abuse its discretion by failing to appoint Smith an expert because he never asked the trial court for an expert and, even if a motion had been made, Smith did not establish the court had the authority to provide him with an expert at no cost. We agree with defendants and will therefore not address the expert appointment issue further.

### 2. *Supplemental Briefing Request*

In May 2019, this court requested supplemental briefing under Government Code section 68081 of issues relating to the trial court's order denying the appointment of

19.

counsel. Based on *Apollo*, *Wantuch* and the California Supreme Court cases addressing the appointment of counsel for indigent defendants in civil cases (*Yarbrough, supra,* 39 Cal.3d 197; *Payne, supra,* 17 Cal.3d 908), we requested the parties to assume that, in certain circumstances, "California trial courts have the discretionary authority to appoint counsel for indigent plaintiffs who are state prisoners." Our questions asked the parties, among other things, (1) how we should interpret the trial court's order in the event the available record was unclear as to whether the trial court conducted the three-step inquiry described in *Apollo* and *Wantuch* before denying the motion for appointment of counsel and (2) what the appropriate remedy should be if the trial court misunderstood the nature and scope of its discretionary authority to appoint counsel.

### 3. *Defendants' Supplemental Brief*

Defendants' supplemental brief stated the trial court did not conduct the three-step inquiry used in *Apollo* and *Wantuch* in deciding Smith's motion for appointment of counsel. Defendants contended that when interpreting the order this court should "presume the trial court knew of its obligations under *Wantuch* and *Apollo* but found them inapplicable because Mr. Smith had raised only an appointment-of-counsel issue, and not a court-access issue." In a related argument, defendants contend that, even if one assumes the trial court misunderstood the nature and scope of its discretionary authority, there is no need to remand with directions for the trial court to conduct that inquiry because "Smith failed to make a prima facie showing of a denial of meaningful access to the courts." In other words, defendants contend there was no duty to conduct the three-step inquiry because Smith's arguments and showing did not trigger that duty.

Defendants also argue that nothing in *Wantuch*, *Apollo* or *Jameson* supports the conclusion that a trial court is obligated to conduct the three-step inquiry every time an indigent prisoner-plaintiff moves for appointment of counsel. Furthermore, defendants contend Smith's situation is not similar to the extraordinary difficulties faced by the

litigants in *Wantuch*, *Apollo* and *Jameson*. In defendants' view, Smith sought a court-appointed attorney not to protect his right to prosecute the action and obtain appellate review, but because he wanted to improve his chances of success in the litigation.[11]

### 4. Smith's Supplemental Brief

Smith's supplemental brief agreed with defendants' statement that the trial court did not conduct the three-step inquiry used in *Apollo* and *Wantuch* in deciding the motion for appointment of counsel. However, Smith disagrees with defendants' contention as to the reason. Defendants contended Smith failed to make a prima facie showing of a denial of meaningful access to the courts. Smith argues he made a prima facie showing and this court can interpret the trial court's "statement about the absence of authority as meaning it did not conduct that three-step inquiry." As to the appropriate appellate relief, Smith contends this court should reverse the trial court's order and instruct it to conduct the three-step inquiry and appoint counsel for purpose of a medical expert. Smith reasserts his argument that a medical expert is necessary to establish the required standard of care and that defendants deviated from it. Smith states an appointed attorney could investigate the misrepresentation of medical records and the untrustworthy documents submitted to the court with the motion for summary judgment.

### D. Interpreting the Trial Court's Order

The first step in our analysis of the trial court's order addresses how to interpret that order. Specifically, was the trial court aware of its discretionary authority to appoint counsel and did the trial court actually exercise that discretion in denying the motion?

---

[11] Where, as here, an inmate's motion satisfies the requirements of nonfrivolousness applicable to civil filings generally (Code Civ. Proc., § 128.7), this distinction relating to the inmate's subjective motivation for seeking counsel is irrelevant to whether the inmate's access to court is being impeded or to the appropriate measures to remedy any impediment.

## 1. Presumption of Correctness

"[I]t is a fundamental principle of appellate procedure that a trial court [order or] judgment is ordinarily presumed to be correct and the burden is on an appellant to demonstrate, on the basis of the record presented to the appellate court, that the trial court committed an error that justifies reversal of the judgment." (*Jameson*, *supra*, 5 Cal.5th at pp. 608–609.) Stated another way, all presumptions are indulged to support the trial court order or judgment "on matters as to which the record is silent, and error must be affirmatively shown." (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 564 (*Denham*).) The presumption of correctness and the allocation of the burden to the appellant is part of the constitutional doctrine of reversible error. (*Ibid.*; see Cal. Const., art. VI, § 13.) This doctrine and the principles derived from it are the foundation for our interpretation of the trial court's written order denying Smith's motion for appointment of counsel. Accordingly, we consider whether the presumption of correctness applies.

## 2. Rules Governing Interpretation of Order

Generally, the "interpretation of an appellate opinion is governed by the rules of construction that apply to any other writing." (16 Cal.Jur.3d (2012) Courts, § 328, p. 880.) Similarly, "[t]he meaning and effect of a judgment is determined according to the rules governing the interpretation of writings generally." (*People v. Landon White Bail Bonds* (1991) 234 Cal.App.3d 66, 76.) We conclude the same rules apply to the interpretation of a written order issued by a trial court. Under those rules, the entire order is taken by its four corners and construed as a whole. (*Ibid.*) Also, the order's language is viewed in light of the facts and the issues before the court, and each statement is considered in its proper context. (See 16 Cal.Jur.3d, *supra*, Courts, § 328, p. 880.)

## 3. Presumption Does Not Apply

As noted, the presumption of correctness applies to "matters as to which the record is silent." (*Denham*, *supra*, 2 Cal.3d at p. 564.) Here, the order was not silent on the matter of the court's authority to appoint counsel. The order discussed the constitutional

right of criminal defendants to be represented and the appointment of the public defender under Government Code section 27706. The order stated Smith was "not subject to criminal prosecution" and no statutory ground for appointing a public defender was present. Thus, the court was not silent on the matter of its authority to appoint counsel. Consequently, we do not *presume* the court was aware of its discretionary authority to appoint counsel and actually exercised that discretion.

### 4. Trial Court Was Unaware of Its Discretionary Authority

Having concluded the presumption of correctness does not apply, we address what the trial court meant when it said it was "without authority to appoint an attorney in this case." Defendants argue this statement means the court concluded Smith failed to make a prima facie showing of a denial of access and, based on this result, the court reached the further conclusion that it had no duty to conduct the three-step inquiry described in *Apollo* and *Wantuch*. Based on the contents of the order as a whole and the context provided by Smith's motion, we interpret the order to mean the court did not recognize it had the discretionary authority to appoint counsel. That discretionary authority is described in *Apollo* and *Wantuch* and is derived from Penal Code section 2601, subdivision (d) and the constitutional protections given the right of access to the courts. The court made no reference to Penal Code section 2601, *Apollo*, *Wantuch*, or the California Supreme Court cases addressing the appointment of counsel for indigent defendants in civil actions. (See *Yarbrough, supra*, 39 Cal.3d at pp. 200–201; *Payne, supra*, 17 Cal.3d at p. 924.) More generally, the court did not mention *civil* litigants' constitutional right of access to the courts. Therefore, we interpret the trial court's order to mean the court did not recognize its discretionary authority.

"[A] court that is unaware of its discretionary authority cannot exercise its informed discretion." (*People v. Brown* (2007) 147 Cal.App.4th 1213, 1228 [sentencing discretion]; see *Doan v. State Farm General Ins. Co.* (2011) 195 Cal.App.4th 1082, 1105

23.

[trial court was unaware of its discretionary authority under statute; the matter was remanded to trial court with directions to exercise its discretion].) Here, the trial court did not recognize its discretionary authority and, as a result, committed legal error in concluding it was without the authority to appoint counsel.

E. Waiver of the Right to Access to the Courts

With some irony, defendants' supplemental brief contends: "By failing to raise an access-to-court argument below, Mr. Smith cannot complain about the issue now under the waiver doctrine." We reject this waiver argument.

First, California law defines waiver as the intentional relinquishment or abandonment of a known right or privilege. (*Smith v. Adventist Health System/West* (2010) 182 Cal.App.4th 729, 745.) Under this definition, waiver is based on intent. (*Ibid.*) The intent to waive may be expressed in words, either oral or written, or implied by a party's conduct. (*Ibid.*) Here, Smith has not expressly relinquished his right of access to the courts. As to an implied relinquishment, Smith's conduct includes pursuing the malpractice claim and, more specifically, filing a motion for appointment of counsel supported by arguments that he was unable to adequately represent himself because of his incarceration, lack of education and training, and probable difficulty in obtaining an expert witness. This conduct demonstrates an intent to use the judicial system to seek the redress for the allegedly substandard medical care, which is inconsistent with an intent to relinquish the right of access to the courts. Therefore, we conclude it is not objectively reasonable to infer Smith intended to give up that right.

Similarly, it is not objectively reasonable to infer Smith had the knowledge required to establish a waiver. Defendants' waiver argument has referred to no documents or other evidence in the record supporting a reasonable inference that Smith knew the nature and extent of his right of access to the court and how that right related to the appointment of counsel pursuant to the trial court's discretionary authority.

Therefore, an intentional relinquishment or abandonment of a *known* right of access is not established by the record.

Second, and most importantly, when an indigent plaintiff in a civil action requests the appointment of counsel, that request should be interpreted as invoking the right of meaningful access to the courts, even if the indigent plaintiff does not explicitly mention that right. Courts generally are required to give pleadings a liberal, yet reasonable, construction (Code Civ. Proc., § 452), and the same approach is warranted when an indigent, self-represented plaintiff requests the appointment of counsel. Based on current State of California and federal constitutional law, it is objectively reasonable to interpret such requests as being based on the right to meaningful access to the courts. The alternate principle, which would conclude a trial court need consider its discretionary authority to appoint counsel if and only if a self-represented, indigent plaintiff explicitly mentions the right of meaningful access, would itself operate as a barrier to meaningful access. We further conclude that trial courts evaluating a request for the appointment of counsel by an indigent plaintiff must (1) recognize their discretionary authority to appoint counsel or implement other measures to afford the plaintiff meaningful access to the courts and (2) exercise that discretion in an informed manner. This obligation or responsibility imposes a small burden on trial courts as they should be aware of their role in the administration of justice, the constitutional principles that define that role, and the rights of persons resorting to the court system. If this responsibility was not inherent in the constitutional and statutory right of access to the courts, then indigent litigants most in need of protection because of their inability to effectively represent themselves would be the least likely to obtain protection.

Consequently, the doctrine of waiver does not preclude this court from considering Smith's right of meaningful access to the courts as the basis for the appointment of counsel or appointment of an expert, even though he did not cite cases such as *Apollo* and *Wantuch* or explicitly mention the right in the trial court proceedings.

25.

F.      Appellate Relief for Failure to Exercise Discretion

Our conclusion that the trial court was not aware of its discretionary authority and, as a result, did not exercise that discretion leads to the following question: What appellate relief, if any, is appropriate? The possible answers include (1) declaring the error harmless; (2) remanding the case to the trial court to exercise its discretion; and (3) directing the trial court to appoint counsel because the circumstances so overwhelmingly favor the appointment of counsel that it would be an abuse of discretion to deny the request.

In *Apollo* and *Wantuch*, the appellate courts chose the middle ground, reversing the judgment and remanding to the trial court to exercise its discretionary authority. (*Apollo*, *supra*, 167 Cal.App.4th at p. 1488; *Wantuch*, *supra*, 32 Cal.App.4th at pp. 795–796; cf. *People v. McDaniels* (2018) 22 Cal.App.5th 420, 426–428 [ordering remand for resentencing where trial court is unaware of its sentencing discretion].) We conclude the same approach is appropriate in this case. There is a reasonable possibility that a result more favorable to Smith would have been reached in the absence of the failure to exercise discretionary authority. (See *Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 574 [test for reversible error in civil case].) Therefore, the error was not harmless.

Conversely, the circumstances are not so overwhelming that the only proper exercise of discretion is the appointment of counsel. While Smith has made a prima facie showing on appeal that he is indigent and his claim is bona fide, the resolution of the first two steps of the three-step inquiry described in *Apollo* and *Wantuch* is better left to the trial court in the first instance. Similarly, the choice among the various measures available to protect the right of access to the courts is better left to the trial court, which is responsible for overseeing the litigation and better situated to evaluate how one or a combination of measures would operate "to ensure indigent prisoner litigants are afforded meaningful access to the courts." (*Apollo*, *supra*, 167 Cal.App.4th at p. 1483, citing *Wantuch*, *supra*, 32 Cal.App.4th at pp. 792–793.) Its choice of measures may be affected

26.

by the answer to the factual questions about compensating experts noted earlier in footnote 9.

Consequently, we reverse the judgment and remand for further proceedings in which the trial court is directed to "first determine whether appellant is indigent" and next determine whether the lawsuit involved a bona fide threat to his personal or property interests. (*Apollo*, *supra*, 167 Cal.App.4th at p. 1485.) If those two conditions are present, the trial court must consider what remedies are available to protect Smith's right to meaningful access to the court, which remedies include the appointment of counsel and the appointment of an expert under Evidence Code section 730. (See *Apollo*, *supra*, at p. 1486; *In re Daniel C. H.* (1990) 220 Cal.App.3d 814, 833 ["trial court has discretion in the appointment and selection of expert witnesses"]; *In re Marriage of E.U. & J.E.* (2012) 212 Cal.App.4th 1377, 1389 [trial court's decision under Evid. Code, § 730 reviewed for an abuse of discretion].)[12]

In the unpublished part of this opinion, we conclude Smith's challenges to the grant of summary judgment have not demonstrated reversible error. Nevertheless, we will conditionally vacate the order granting the motion for summary judgment pending the outcome of the further proceedings relating to Smith's right of access to the courts. Those further proceedings might result in the adoption of measures that cause the trial

---

[12]    We do not reach the following legal question, which has not been briefed by the parties: Are California trial courts required to place on the record explicit oral or written findings explaining the exercise of their discretionary authority? We note, however, that in some contexts involving discretionary determinations, such findings are required "to make meaningful appellate review possible." (*Ramos v. Countrywide Home Loans, Inc.* (2000) 82 Cal.App.4th 615, 629 [explicit findings required when trial court departs from lodestar attorney fee approach and applies a multiplier]; cf. *Jackson*, *supra*, 811 F.2d at p. 262 [federal trial courts should make specific findings on each of the relevant factors when deciding a motion for appointment of counsel in a civil rights case]; *Robbins v. Maggio* (5th Cir. 1985) 750 F.2d 405, 413 [district courts' cursory findings insufficient; cases remanded for more specific findings as to why counsel was denied in each of the cases].)

court to reopen the motion for summary judgment, consider Smith's previous opposition papers (see fn. 3, *ante*), and allow Smith or an attorney representing him to present additional materials or more refined arguments in opposition.

II.     SUMMMARY JUDGMENT[*]

Despite the reversal on another ground, we must consider whether Smith has demonstrated the grant of summary judgment was error.  If Smith's arguments warrant the entry of an order denying the motion for summary judgment, the further proceedings conducted on remand will be affected.

        A.     <u>Medical Treatment at Pleasant Valley</u>

On September 6, 2011, Smith met with medical staff for an intake evaluation for his arrival at Pleasant Valley.  The medical records reflect Smith was evaluated and medical staff noted his chronic shoulder pain, continued his pain medication, and scheduled a further evaluation by a primary care provider.  Later in September, Smith met with a physical therapist for an evaluation of his shoulder, received a recommendation of physical therapy once a week, and had five sessions for shoulder therapy.

On October 18, 2011, Smith met with Nurse Practitioner I. Ogbuehi for a primary care evaluation.  Smith was provided an initial pain assessment form on which he specified he was suffering from pain in his left shoulder, lower back and right knee.  A week later, Smith again met with Ogbuehi.  The records reflect she completed a chronic pain intake sheet in which she noted Smith's shoulder was his main source of pain.  Smith disputes that his shoulder was the "main" source of his pain, stating he had informed her of his back and knee pain.

On December 5, 2011, Smith again met with Ogbuehi.  The parties dispute the purpose of this meeting.  Defendants assert Smith refused examination and became angry

---

[*]     See footnote, *ante*, page 1.

28.

and left when told of the plan to taper his pain medication. Smith asserts the visit was supposed to be a follow-up and "[t]he follow-up was only physical therapy and pain medication." Defendants assert the records show Ogbuehi continued Smith's pain medication until the next chronic pain follow-up visit.

On December 21, 2011, Smith again met with Ogbuehi. Defendants assert the records indicate Smith told Ogbuehi that he refused examination and she referred Smith to the pain management clinic. Smith asserts he "said to Nurse Practitioner Ogbuehi, if I am here to talk about medication and 'not' my chronic pain condition I am gone. I left. It was not about my knee, back, or shoulder."

### 1. Left Shoulder

On January 11, 2012, Smith met with the Clinical Case Management Review Committee. Defendants assert the records reflect Smith's main complaint was his left shoulder and the committee recommended reevaluation by an orthopedic surgeon. Smith contends his left shoulder was not his main complaint, but it was the only complaint that Ogbuehi and the committee would concern themselves with.

On February 10, 2012, Smith's shoulder was evaluated by Dr. Y. N. Paik of the Pacific Orthopedic Medical Group. Dr. Paik requested an x-ray and arthrogram and recommended passive range of motion exercises in the meantime. On May 4, 2012, after the x-ray and arthrogram were completed, Smith again met with Dr. Paik, who recommended arthroscopic joint debridement, excision of multiple loose bodies and sub-acromical decompression, and repair of the rotator cuff. Dr. Paik recommended continuing the exercises and pain medication. In August 2012, Smith underwent arthroscopic joint debridement and sub-acrominal decompression to his left shoulder. Attempts to reattach his rotator cuff were unsuccessful. On August 20, 2012, Smith met with Dr. Paik, who opined that Smith was not a candidate for reattachment of the rotator

cuff due to retraction and extensive tear.  Dr Paik recommended intensive exercise to build strength in the shoulder.

Smith disagreed with this opinion, stating his tendon could be repaired and he should have been a candidate for reattachment.  Defendants address Smith's claim relating to delayed treatment of his shoulder by asserting the date upon which the tendon could have been accessible in surgery before retraction is not known.  Smith disputes this assertion, stating the March 28, 2012, arthrogram revealed a supraspinatus tendon tear and not a retraction of the tendon.  Thus, one of the claims alleged by Smith in this litigation is that his shoulder became unrepairable due to delays in his treatment at Pleasant Valley.[13]

After the arthroscopic procedure to his shoulder, Smith underwent physical therapy and the pain in his left shoulder lessened.  Medical records reflect Smith completed physical therapy for his shoulder in June 2013 and his pain had decreased.  Records from a September 2016 evaluation of Smith at Folsom reflect Smith reporting intermittent morning stiffness in the shoulder, but his shoulder was not noted as one of his current conditions.

### 2.    Back Condition

While at Pleasant Valley, Smith complained of pain related to his back condition.  On October 25, 2011, Ogbuehi performed tests related to the back complaint, including a straight leg raise test and an axial loading test.  From June 2012 through December 2013, the medical records describe nine meetings between Smith to Ogbuehi in which she evaluated Smith and reported a negative straight leg raise test.  Smith disputes the completeness and correctness of the leg raise test and appears to contend the failure to

---

**13**    Defendants' medical expert noted Dr. Paik did not call for immediate surgery after the February 2012 initial consultation or the May 2012 evaluation.  The expert states Smith cannot establish an earlier surgery, such as a surgery prior to Ogbuehi's initial evaluation of Smith in October 2011, would have been successful.

properly conduct the test is one reason for the inappropriate handling of his pain medication.

### 3. *Right Knee*

While at Donovan, no arthroscopic surgery was performed on the meniscus tear in Smith's right knee because his shoulder injury precluded the use of crutches. Smith contends Ogbuehi would not accept his documents about his knee problem and she took 11 months to call the records office and get his file, which showed he had a meniscus tear and a recommendation from an orthopedic surgeon for surgery. In June 2012, Smith submitted an inmate grievance relating to the treatment of his knee. In July 2012, Smith requested knee surgery, which was denied because Smith had not completed physical therapy. From August through October 2012, Smith received 10 physical therapy sessions for his knee. No knee surgery was performed while Smith was at Pleasant Valley or after his transfer to Folsom.

### 4. *Pain Medication*

Smith contends his pain medication was mishandled while at Pleasant Valley. He claims his morphine was inappropriately reduced and his gabapentin was inappropriately withdrawn. Smith also claims he was inappropriately prescribed oxcarbazepine and amitriptyline.

While at Donovan, Smith was given extended release morphine and his dosage increased to 30 milligrams (mg) three times per day. Initially, this morphine dosage was continued at Pleasant Valley.

In September 2011, Smith's noon morphine dosage was changed from 30 mg of extended release morphine to 30 mg of instant release morphine. On November 20, 2011, Smith's gabapentin prescription was discontinued.

In December 2011, Smith's morphine prescription was reduced from 90 mg per day to 60 mg per day for seven days, then reduced to 45 mg per day for seven days, and

31.

then 30 mg per day. However, on January 20, 2012, Ogbuehi increased Smith's morphine from 30 mg per day to 75 mg per day. In October 2012, after Smith's shoulder surgery and physical therapy, Ogbuehi met with Smith and proposed reducing his morphine prescription. The medical records reflect Smith was offered 60 mg of morphine per day from October 4, 2012, to October 9, 2012, and 45 mg per day from October 10, 2012, to September 6, 2013.[14] On September 6, 2013, Smith's morphine prescription was increased to include a morning dose. For the remainder of his time at Pleasant Valley, Smith received 15 mg of extended release morphine in the morning, 15 mg of instant release morphine at noon, and 30 mg of extended release morphine in the evening.

The medical records reflect Ogbuehi proposed prescribing amitriptyline (Elavil) for Smith's chronic pain, which Smith refused. Amitriptyline is a tricyclic antidepressant drug used in treating neuropathic pain, with or without coexisting depression. Because Smith was not actually administered amitriptyline, defendants' expert opined that he was not harmed by the proposal for its use.

B.    Contentions of the Parties

1.    *Smith's Opening Brief*

Smith contends he was denied the standard of care applicable to a neurologist for his spinal condition and an orthopedic specialist for the meniscus tear in his right knee. He argues defendants were under a duty to exercise that degree of diligence, care and skill ordinarily possessed by other members of the profession and the failure to do so is malpractice. He appears to argue the evidence presented by defendants did not establish they performed in accordance with the applicable standard of care. He argues defendants did not present any declarations stating their degree of learning and training. He also

---

**14**    In December 2012, the medical records reflect Ogbuehi prescribed oxcarbazepine for back pain. Smith contends he never once took oxcarbazepine and, therefore, the statement in the records that he refused to *continue* the prescription are inaccurate.

32.

argues Dr. Duenas's declaration is insufficient to support the entry of summary judgment because she was a physician and surgeon and did not specialize in neurology or orthopedics.

### 2. *Defendants' Response*

First, defendants contend it was not essential for them to submit their own declarations because the declaration of their expert, Dr. Duenas, was sufficient to carry their burden of showing their conduct fell within the community standard of care and, therefore, they were entitled to summary judgment unless Smith came forward with conflicting expert evidence. (*Munro v. Regents of University of California* (1989) 215 Cal.App.3d 977, 985; see *Howard v. Owens Corning* (1999) 72 Cal.App.4th 621, 632 [discussion of exceptional principle requiring fact finder to accept uncontradicted expert testimony in professional negligence cases where standard of care must be established by expert testimony].) Second, they argue Dr. Duenas was qualified as a medical expert and California law does not require a medical expert to specialize in the particular field in question.

### 3. *Smith's Reply*

Smith contends the declaration of Dr. Duenas is conclusory and insufficient to establish defendants were entitled to summary judgment. Based on this failure to carry their initial burden, Smith argues it was not necessary for him to file a declaration of a medical expert to contradict Dr. Duenas's declaration. In addition, Smith presents the following argument:

> "Plaintiff deposition was taken on Aug. 30, 2016 and the Attorney General ask for Dr. Duenas for her expert opinion and receive it Dec. 13, 2016. The court could clearly infer that the expert declaration was made on the information provided by the Attorney General for the purpose of the lawsuit. The declaration of Dr. Duenas is conclusory and insufficient to withstand summary judgment. [¶] The judgment must be reversed."

Subsequently, Smith restated the point that the opinions in Dr. Duenas's declaration "were based on information she was provided by Attorney General after Plaintiff was deposed."

C.      Qualifications of a Medical Expert

The qualification of a witness as an expert is addressed in Evidence Code section 720, subdivision (a), which states:  "A person is qualified to testify as an expert if he has special knowledge, skill, experience, training, or education sufficient to qualify him as an expert on the subject to which his testimony relates."  Under this statute, "[w]hether a particular witness has the qualifications necessary to give an expert opinion on a specific topic is an issue primarily left to the trial court's broad discretion, and it is difficult to attack that exercise of discretion" on appeal.  (Kennedy & Martin, Cal. Expert Witness Guide (Cont.Ed.Bar 2d ed. 2018) § 3.1, p. 3-1.)

In *Brown v. Colm* (1974) 11 Cal.3d 639, our Supreme Court stated:  "The unmistakable general trend in recent years has been toward liberalizing the rules relating to the testimonial qualifications of medical experts."  (*Id*. at p. 645.)  Later in the opinion, *Brown v. Colm,* the court referred to this trend and described cases in which a medical expert was not required to have expertise as to the precise injury involved in the litigation:

> "[A] pathologist was qualified to testify as to causes of aseptic necrosis (*Agnew v. City of Los Angeles* (1950) 97 Cal.App.2d 557, 566 [218 P.2d 66]); an expert in otolaryngology to testify regarding plastic surgery (*Mirich v. Balsinger* (1942) 53 Cal.App.2d 105 [127 P.2d 639]); a homeopathic physician and surgeon to testify on the degree of care required of a physician educated in the allopathic school of medicine (*Hutter v. Hommel* (1931) 213 Cal. 677, 681 [3 P.2d 554]); a pathologist and professor of pathology to testify on the subject of gynecology (*Cline v. Lund* [(1973)] 31 Cal.App.3d [755,] 766)."  (*Brown v. Colm, supra,* at p. 646.)

Subsequent decisions by the Courts of Appeal have recognized that "work in a particular field is not an absolute prerequisite to qualification as an expert in that field."

34.

(*Osborn v. Irwin Memorial Blood Bank* (1992) 5 Cal.App.4th 234, 274.)  For instance, in *Miller v. Silver* (1986) 181 Cal.App.3d 652, the Second District determined a psychiatrist was competent to testify on the standard of care for a plastic surgeon's administration of antibiotic therapy to an implant patient.  (*Id*. at p. 660.)  After examining the content of the psychiatrist's declaration, the Second District concluded it was sufficient to create a triable issue of fact and reversed the summary judgment in favor of the plastic surgeon.  (*Id*. at pp. 661–662.)

Based on the foregoing cases, we conclude Dr. Duenas need not be a specialist in neurology or orthopedics to give an expert opinion on the standard of care.  Accordingly, we reject Smith's argument that Dr. Duenas was not qualified to provide an expert opinion about whether the care he received met the applicable standard of care.

D.      Dr. Duenas's Declaration Was Not Shown to Be Conclusory

Smith makes the general assertion that Dr. Duenas's declaration was conclusory and, therefore, did not provide sufficient evidence to justify the grant of a summary judgment.  This argument is not adequately developed to inform this court of the specific conclusions being challenged.  We note that Dr. Duenas's declaration was 30 pages long (without attachments) and contained 93 numbered paragraphs.  Under heading "IV. Plaintiff's Shoulder Condition," Dr. Duenas spent about five pages describing excerpts from Smith's medical records, the injury to the shoulder, and a chronology of the care given.  That description preceded her opinion that defendants' "handling of plaintiff's shoulder condition did not cause the claimed harm plaintiff pled in his amended complaint."  Similarly, other sections of the declaration addressed Smith's back condition, knee condition, the medications prescribed, and the claimed causal link between defendants' actions and Smith's continuing pain.

Without a more detailed argument from Smith, it is not possible for this court to decipher precisely how Smith believes the opinions provided by Dr. Duenas are

35.

conclusory or, alternatively, how the declaration fails to provide an adequate description of the basis for the opinions. It may be that Smith viewed Dr. Duenas's declaration as conclusory because his response to defendants' separate statement raises specific points not addressed in her declaration. For instance, Smith contends the March 28, 2012, arthrogram revealed a supraspinatus tendon tear and not a retraction of the tendon. When this contention is compared to Dr. Duenas's general statement about retraction of the tendon,[15] one can see why Smith might regard her statement as conclusory. A second example of why Smith might view Dr. Duenas's declaration as conclusory relates to his specific claim that Ogbuehi did not properly conduct the straight-leg test for evaluating low back pain because she simply asked him to straighten his leg while he was seated in a chair. Although we cannot evaluate the merits of Smith's arguments about the test given the record and procedural posture of this case, we recognize the reason Dr. Duenas did not address these specific arguments is that they were not raised by Smith at a point in the proceedings where defendants had an opportunity to respond.

Consequently, we conclude Smith has not demonstrated the trial court erred in relying on Dr. Duenas's opinions to conclude defendants had carried their initial burden of establishing facts that justify a judgment in their favor. (See *Brantley v. Pisaro* (1996) 42 Cal.App.4th 1591, 1602 [second step of summary judgment analysis addresses whether the moving party's evidence makes a prima facie showing that justifies a judgment in movant's favor and shifts burden to opposing party to show the existence of a triable issue of material fact].) We note, however, that Smith's inability to state this argument clearly and his failure to conduct discovery on the specific points raised are indicative of his ability to effectively represent himself in this action and the complexity

---

[15] In her declaration, Dr. Duenas stated: "The date upon which the tendon could have been accessible in surgery before retraction is not known."

of the legal and factual aspects of this case, which are circumstances relevant to his right of access to the courts and the requests for the appointment of counsel and an expert.

E.   Absence of Declarations from Defendants

Smith's opening brief asserts defendants did not submit their own declarations stating that they have the degree of learning and skill ordinarily possessed by a neurologist or neurosurgeon or by an orthopedic specialist or orthopedic surgeon. Defendants contend this assertion does not establish a reversible error because (1) the law does not require defendants to present their own declarations to support a summary judgment motion and (2) they carried their burden concerning the sufficiency of the care provided to Smith by presenting an expert declaration that defendants' conduct met the community standard of care.

Again, Smith's argument is not presented in enough detail to determine the precise challenge he is making to defendants' evidence.  In view of Smith's disputes of the accuracy of the contents of Ogbuehi's entries in his medical reports, Smith might be asserting that he has sufficiently challenged the credibility or reliability of those records. Stated another way, because Smith claims that the medical records do not accurately reflect what occurred in the meetings with him, Smith might think he has created a triable issue of material fact.  Furthermore, Smith may be contending these questions of fact about what information was communicated during the appointments undermines Dr. Duenas's opinions about the adequacy of the care given because Dr. Duenas simply assumed the entries on the medical records were accurate.  (See *Griffith v. County of Los Angeles* (1968) 267 Cal.App.2d 837, 847 [expert opinions, though uncontradicted, are worth no more than the reasons and factual data upon which they are based]; CACI 219 [in deciding whether to believe an expert's testimony, jury should consider the facts relied upon by the expert]; see generally, *Dale v. Lappin* (7th Cir. 2004) 376 F.3d 652,

655 [inmate plaintiff's affidavit, which was detailed, specific and based on personal knowledge, was competent evidence to rebut motion for summary judgment].)

The current form of Smith's argument about the lack of declarations from each defendant appears categorically—that is, a contention that a motion for summary judgment by medical malpractice defendants must always be denied when it is not supported by defendants' own declarations setting forth their education and training. We are aware of no authority supporting such a broad rule. Nothing in Code of Civil Procedure section 473c categorically requires a motion for summary judgment be supported by declarations setting forth the experience and training of the moving parties. Also, we have located no published decisions imposing such a broad requirement.

## DISPOSITION

The judgment is reversed. The matter is remanded to the trial court to vacate its order denying the motion for appointment of counsel and to conditionally vacate its order granting the motion for summary judgment. The motion for summary judgment shall remain pending while the trial court conducts further proceedings not inconsistent with this opinion, which shall include setting a schedule for supplemental briefing[16] from the parties on Smith's right of access to the courts and the relationship of that right to his request for appointment of counsel and the pending motion for summary judgment.

---

**16** In his supplemental brief, Smith is not precluded from requesting the appointment of an expert under Evidence Code section 730 because that is one of the measures available to a trial court to protect an indigent prisoner's right to meaningful access to the courts. Moreover, a trial court has the discretion to consider such a measure, whether or not requested by the inmate. In other words, an inmate may not restrict the measures available to the trial court by omitting some measures from his or her request.

Appellant shall recover his costs on appeal.

                                        _____

                                        FRANSON, Acting P.J.

WE CONCUR:


_____

PEÑA, J.


_____

DESANTOS, J.